UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ELIZABETH A. REIS,<br>Plaintiff,<br><br>vs.<br><br>NATIONAL PASSENGER RAILROAD CORPORATION, A/K/A NATIONAL RAILROAD PASSENGER CORPORATION,<br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 07-236S |

**DEFENDANT NATIONAL PASSENGER RAILROAD CORPORATION'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule Cv 56, defendant National Passenger Railroad Corporation, a/k/a National Railroad Passenger Corporation ("Amtrak") submits this Statement of Undisputed Facts in support of its Motion for Summary Judgment.

## Undisputed Facts

### The Incident

1. Plaintiff Elizabeth Reis ("Plaintiff"), purchased a ticket to travel on June 23, 2004 from Providence, Rhode Island to New York City, New York on an Amtrak "Acela" train (the "Acela"), in order to attend a trade show on behalf of her employer, the Providence Warwick Convention & Visitors Bureau. (Plaintiff's Complaint ("Compl.") at ¶ 3; Deposition Transcript of Elizabeth Reis ("Reis Tr.") at 8: 1-15; 53: 12-13.) (A copy of Plaintiff's Deposition Transcript is attached hereto as Exhibit A.)

2. On June 23, 2004, Plaintiff arrived at the Providence Train Station and took the elevator down to the track level in order to board the 9:50 a.m. Acela. (Reis Tr. at 52: 6-14; 62: 9-10.)
3. Plaintiff exited the elevator and immediately boarded the last car on the train—the "quiet car"—the door to which was "seconds" away from the elevator door. (Reis Tr. at 52: 24; 53: 1; 62: 8-17.)
4. Plaintiff believes that she was one of the last passengers to board the train. (Reis Tr. at 62: 8-9.)
5. Plaintiff began walking at a "regular" pace through the quiet car, looking straight ahead and carrying her briefcase, suitcase and purse. (Reis Tr. at 60: 18-23; 63: 8-11; 64: 7-22; 67: 3-20.)
6. She saw approximately ten individuals on the train, including one woman who was standing in the aisle to Plaintiff's right "putting something up in the luggage bin." (Reis Tr. at 52: 20-24; 53: 1-2; 60: 24; 61: 1-5; 63: 12-20; 64: 23-24.)
7. There were no Amtrak employees in the quiet car when Plaintiff boarded the train. (Reis Tr. at 63: 24; 64: 1-6.)
8. "Mere moments" after boarding the train, Plaintiff tripped and fell toward the end of the car over something that she believes was at the place where the woman was standing and storing her luggage, went "airborne," and landed in the train's vestibule with her left side "smashed into [the left] corner" of the vestibule. (Reis Tr. at 61: 17-24; 65: 15-23; 66: 2-6.)
9. Plaintiff had walked no more than twenty-five (25) feet before she fell. (Reis Tr. at 61: 19-24; 62: 1-3.)

10. Plaintiff did not see any luggage in the aisle when she boarded the train or before she fell as she was looking straight ahead and not at the floor. (Reis Tr. at 60: 18-23; 63: 1-3, 8-11; 68: 2-5.) She did not have any trouble seeing. (Reis Tr. at 86: 10-12.)

11. Plaintiff did not see any luggage in the aisle of the car when she boarded the train. (Reis Tr. at 63: 8-11.)

12. Plaintiff did not see any luggage in the aisle prior to falling. (Reis Tr. at 63: 1-3; 68: 2-8.)

13. Plaintiff did not see any luggage in the aisle after she fell. (Reis Tr. at 68: 9-18; 69: 3-5.)

14. In fact, Plaintiff "[doesn't] know for sure" what she fell over. (Reis Tr. at 69: 13-18; Exhibit B at p. 1.)

15. Plaintiff gave a statement to Seth Starr of the Amtrak Claims Department on July 2, 2004, appended hereto as Exhibit B. (Reis Tr. at 47: 24; 48: 1-2.) She confirmed that the appended transcript was an accurate transcription of her tape-recorded conversation with Mr. Starr. (Reis Tr. at 48: 5-8.)

16. Although Plaintiff cannot positively identify what she tripped over on the train, and told Mr. Starr in her tape recorded statement that she did not know what she fell over, Plaintiff now "believes" it was a piece of luggage because she tripped "right at the point" where a woman was "putting something up in the luggage bin" and because she remembers hearing "out of the corner of [her] ear…a woman's voice saying 'I'm sorry. Oh, I'm so sorry.'" (Reis Tr. at 63: 15-17; 65: 2-24; 66: 7-13; 69: 4-8; Exhibit B at p.1.)

17. Plaintiff does not believe that she tripped by getting her heel caught as she entered the vestibule because she inspected the shoes she was wearing on the date of the incident and they were in "absolutely perfect condition;" if her heel had gotten caught, there would

have been some type of damage to the heels of her shoes. (Reis Tr. at 59: 11-24; 60: 1-4.)

18. After her fall, Plaintiff believes she may have blacked out briefly, but is uncertain. (Reis Tr. at 58: 22-24; 59: 1-2; Exhibit B at p. 1.) She does remember that when she opened her eyes after her fall, she was lying on the floor of the vestibule with her right leg under her left and with her left side pushed into the left side of the vestibule and all that she saw was a metal bar, which she tried to pull herself up on, but couldn't. (Reis Tr. at 81: 21-24; 82: 1.)

19. An Amtrak employee, possibly a conductor, asked Plaintiff a number of times if she would be staying on the train or if she would be getting off, as they needed to depart from the Providence station. (Reis Tr. at 82: 2-6.)

20. Each time, in response, Plaintiff said "Just give me a minute," and repeatedly tried to pull herself up on the metal bar. (Reis Tr. at 82: 6-10.)

21. At some point in time, a "very nice" Amtrak police officer (the "Officer") lifted Plaintiff off of the vestibule floor and took her off of the train. (Reis Tr. at 82: 14-16; Exhibit B at p. 2.)

22. In none of Plaintiff's statements after her injury does she state that she told any Amtrak employee that she did not want to be moved off of the train onto the platform or that she wanted to remain on the train. (*See* Reis. Tr. at 47-53, 57-70, 81-87; Exhibit B.)

23. Plaintiff does not remember whether the train remained at the station or departed before rescue services arrived. (Reis Tr. at 52:15-19; 86: 13-16.)

24. Although the Officer suggested that she sit on the ground while waiting for rescue services to arrive, Plaintiff was wearing a dress and "couldn't get down to the ground," so

she stood with her right elbow on the Officer's shoulder and with her right knee bent so that her foot was held above the ground for the approximately ten minutes it took for rescue services to reach her on the platform. (Reis Tr. at 82: 16-21; Exhibit B at p. 2-3.)

25. An Amtrak employee brought Plaintiff a wheelchair, however paramedics arrived moments later and transported her by ambulance to Rhode Island Hospital where she was diagnosed with multiple fractures of her right forefoot. (Reis Tr. at 86: 13-17; Exhibit B at p. 2-3.)

**Plaintiff's Legal Claims Relating To The Incident**

26. Shortly after the incident, Plaintiff called the Amtrak Claims Department and spoke to Martha O'Neil about making a legal claim against Amtrak. (Reis Tr. at 48: 18-24; 49: 15-22; 50: 2-14.) Ms. O'Neil told the Plaintiff that she would forward Plaintiff's name to Seth Starr, of the Amtrak Claims Department. (Reis Tr. at 50: 8-14.) During one conversation with Mr. Starr, Plaintiff "remember[s] Mr. Starr saying something like 'we pay' - - he said something, something and then 'we pay - - we would then pay worker's comp back." (Reis Tr. at 51: 16-19.)

27. On July 2, 2004, Mr. Starr called Plaintiff and conducted a tape-recorded interview of Plaintiff regarding the June 23, 2004 incident. (Reis Tr. at 47: 10-24; 48: 1-8; Exhibit B.) Plaintiff stated under oath that she understood that this conversation was the beginning of her process of making a legal claim against Amtrak. (Reis Tr. at 49: 20-24; 50: 1.)

28. On September 8, 2004, Plaintiff's personal injury counsel, Michael J. Farley, Esq., sent two letters on Plaintiff's behalf: one to the PWCVB regarding Plaintiff's desire to return to work in whatever capacity possible and the other to Beacon Mutual Insurance

Company regarding Plaintiff's desire to see a rheumatologist regarding a flare up in her pre-existing fibromyalgia. (*See* Exhibit C; Exhibit D, authenticated in Reis Tr. at 36-38.)

29. On December 1, 2004, with Plaintiff's knowledge, Plaintiff's attorney sent an initial demand letter to Mr. Starr requesting any information regarding any investigations that had been done relative to Plaintiff's June 23, 2004 injury and a copy of the July 2, 2004 recorded statement. (Exhibit E, authenticated in Reis Tr. at 74: 2-7.)

30. On April 18, 2005, Plaintiff filed a voluntary Chapter 7 petition ("Voluntary Petition") in the United States Bankruptcy Court for the District of Rhode Island. (Reis Tr. at 74: 22-24; 75: 1-2; 76: 9-10; Certified copy of Ms. Reis' Voluntary Bankruptcy Petition, appended hereto as Exhibit F.)

31. Plaintiff was represented by Robert B. Jacquard, Esq. throughout the bankruptcy proceedings. (Reis Tr. at 75: 3-4.) Plaintiff's brother, an attorney, referred Attorney Jacquard to Plaintiff because he "had a knowledge of bankruptcy court" and "he had high abilities." (Reis Tr. at 75: 3-17; 79: 23-24; 80: 1-8.)

32. Plaintiff listed on her Voluntary Petition a Worker's Compensation claim, previously filed as a result of the June 23, 2004 fall on the Acela, as "Other personal property of any kind not already listed," as well as "Property Claimed As Exempt." (Reis Tr. at 76: 17-24; 77: 1-5; 79: 17-22; Exhibit F at Schedule B, no. 33, Schedule C.)

33. Plaintiff testified that she did not list her interest in the instant claim anywhere on her Voluntary Petition. (Reis Tr. at 77: 18-21; 81: 5-8.) Thus, under penalties of perjury, Plaintiff represented to the Bankruptcy Court that she had no other contingent and unliquidated claims of every nature and no other personal property of any kind not listed on the Voluntary Petition. (Reis Tr. at 77: 18-21; Exhibit F at Schedule B, no. 20, 33.)

34. When asked about why she did not list the instant claim anywhere on her Voluntary Petition, Plaintiff first answered that it was because "at the time it wasn't formally in litigation" and she "didn't even know if we were going to go to litigation with Amtrak" and later repeatedly refused to answer questions regarding her decision not to list the claim on the grounds of attorney-client privilege. (Reis Tr. at 77: 6-17; 78: 17-24; 79: 1; 80: 16-24; 81: 1.)

35. Plaintiff was granted a discharge under section 727 of title 11 of the United States Bankruptcy Code on July 25, 2005. (Reis Tr. at 81: 9-13; Exhibit F at Discharge of Debtor.)

36. Plaintiff initiated this litigation—nearly two years after she received a discharge from the Bankruptcy Court—on June 1, 2007, in Providence County Superior Court.

37. In her Complaint, Plaintiff asserts claims of respondeat superior, intentional tort, negligence, and breach of contract.

38. Specifically, Plaintiff alleges that Amtrak employees' intentional tortious acts significantly enhanced and aggravated the injuries she sustained when she tripped and fell into the vestibule of the Acela, and also caused her further injuries. (Compl. ¶¶ 8-12, 19, 21.)

39. Plaintiff also asserts that Amtrak employees' negligence caused aggravation of her pre-existing injuries, as well as new injuries, apparently, although not specifically plead, by negligently allowing a piece of luggage to remain in the train's aisle. (Compl. at ¶ 27.)

40. Amtrak removed the case to the United States District Court for the District of Rhode Island on June 26, 2007.

**Plaintiff's Treatment Since The Date Of The Incident**

41. Emergency room doctors at Rhode Island Hospital diagnosed Plaintiff with multiple fractures of her right forefoot. (Exhibit B at p. 3.)

42. Over almost five years since the date of the accident, Plaintiff periodically has sought treatment for pains associated with a fibromyalgia flare-up, knee pains, neck pains stemming from a herniated disc, shoulder pains, and pain in her right foot. (*See* Compl. at ¶¶ 5,9,19,21; Reis Tr. at 23: 10-13; 34: 19-24.)

43. There is no objective evidence in Plaintiff's medical documents to support the allegation that lifting Plaintiff off of the floor of the train, moving her onto the platform and having her stand, supported, dangling her foot off of the ground caused her any new injuries or furthered any injury sustained during her initial fall. (*See* Declaration Under Penalty of Perjury of Joseph S. Barr, Jr., M.D., attached hereto as Exhibit G, at ¶ 7-12.)

DEFENDANT,
NATIONAL RAILROAD
PASSENGER CORPORATION,

/s/ Paul E. Dwyer, Jr.
Paul E. Dwyer, Jr. (#3956)
Andrew J. Murray (#5071)
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903-2499
(401) 274-9200 (tel.)
(401) 276-6611 (fax)

CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of February, 2008, I served a copy of the within document by causing a copy to be sent via First Class U.S. Mail, postage pre-paid to the below named counsel.

TO: Frederick A. Costello, Esquire
Flaherty, Butterfield & Costello
33 College Hill Road, Suite 20D
Warwick, RI 02886

/s/ Paul E. Dwyer, Jr.