# EXHIBIT A

Volume I
Pages 1 to 95
Exhibits 1 to 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - - x

ELIZABETH A. REIS,
Plaintiff,

vs.

NATIONAL PASSENGER RAILROAD CORPORATION, A/K/A NATIONAL RAILROAD PASSENGER CORPORATION,
Defendant.

Civil Action No. 07-236S

- - - - - - - - - - - - - - - - - x

DEPOSITION OF ELIZABETH A. REIS, a witness called on behalf of the Defendant, taken pursuant to the Federal Rules of Civil Procedure 30, before Grant D. Hackett, Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Edwards, Angell, Palmer & Dodge, LLP, Providence, Rhode Island, on Monday, December 10, 2007, commencing at 10:10 a.m.

PRESENT:

Flaherty, Butterfield & Costello
(by Frederick A. Costello, Esq.)
33 College Hill Road, Suite 20D, Warwick, RI 02886, for the Plaintiff.

Edwards, Angell, Palmer & Dodge, LLP
(by Paul E. Dwyer, Esq.)
2800 Financial Plaza, Providence, RI 02903-2499, for the Defendant.

Also Present:
Seth Starr
Nancy Van der Veer

* * * * *

P R O C E E D I N G S

ELIZABETH A. REIS

a witness called for examination by counsel for the Defendant, having been satisfactorily identified by the production of her driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DWYER:

Miss Reis, my name is Paul Dwyer. I represent Amtrak in a case you've brought against Amtrak pending in the United States District Court for the District of Rhode Island. We're here today to take your deposition, which is essentially a statement under oath. I'll be asking questions, and you'll be responding to them.

If at anytime you need a break during the deposition, please let me know and we can accommodate you. At times during the deposition your attorney may object. You can answer the question unless your attorney instructs you otherwise.

Also, you have to be careful to answer verbally because the court reporter can't take down

Q. When did you return to Rhode Island?
A. In May of 2003.
Q. Why did you return to Rhode Island?
A. For a job position.
Q. Where was that?
A. At the Providence Warwick Convention and Visitor's Bureau.
Q. Subsequent to your termination from the position in the Warwick -- what was the name of the business?
A. Providence Warwick Convention and Visitor's Bureau.
Q. Is it called something for short we can use during this deposition?
A. PWCVB.
Q. Have you worked since the date of your injury, since your termination?
A. No.
Q. No consultations outside or anything like that?
A. I talked to a friend who has a company in Boston, and for two or three weeks I did him a favor by doing some research.
Q. Who was that friend?

of the fibromyalgia related to the incident on the Amtrak train in June of 2004?

A. Correct.

Q. Has any physician told you if this flare-up will end?

A. No.

Q. Has any doctor told you that this flare-up will continue into the future?

A. No.

Q. How often do you see a physician for treatment of the fibromyalgia?

A. Once every -- it's about once every three months.

Q. Who do you see?

A. Dr. Dillon --

Q. Where is he located?

A. -- and Dr. Edgeness. Dr. Dillon is a rheumatologist that I'm seeing.

Q. Where is Dr. Dillon located?

A. On Toll Gate Road.

Q. And what about Dr. Edgeness? Where is he located?

A. On Sapianset Crest Road in Cranston.

Q. Why did you switch to Dr. Dillon?

A. I don't remember.

Q. How long did you take the Oxycontin and Percocet for the foot?

A. I don't remember that either.

Q. Do you recall was it longer than six months?

A. I don't know for sure.

Q. How does the fibromyalgia limit your daily living?

A. Well, it's not just my fibromyalgia. It's my neck and it's -- the two dislocated disks in my neck and also the torn rotator cuff in my shoulder. So, you know, I definitely don't do all of the things that I used to be able to do. I don't cook big dinners anymore, you know. Dinners consist of soup and sandwiches and -- you know, when I first had the accident, it literally consisted of cereal. And that is the truth.

Q. Has any doctor told you your neck injury is related to the incident?

A. I don't know.

Q. Did any doctor tell you that your shoulder pain was related to the incident?

A. Dr. Wiggins, I think, did say that.

Q. Do you recall when Dr. Wiggins said that?

A. No. When I went to see him and they did the MRI.

Q. There was a time where you, through your attorney, Mr. Farley, sought to go back to work on a part-time or limited basis; is that correct?

A. I was asked by the CVB.

MR. DWYER: Mark this as Exhibit 1.

(Document marked as Reis Exhibit 1 for identification)

Q. Could you just look at the exhibit.

A. (Witness complies) That's not true.

MR. COSTELLO: Wait for a question.

Q. Have you finished reading that document?

A. Yes.

Q. Mr. Farley was your original attorney in this matter, correct?

A. He was.

Q. And he writes to the Providence Warwick Convention Visitors Bureau -- and tell me if I read this correctly, beginning of the second paragraph -- "However, she has asked me to explore her return to work on a limited basis, the duties of which would be within the parameters of her physical

impairment." Did I read that correctly?

A. That's what it says.

Q. Did you ask your attorney to seek return to employment on a limited basis?

A. No.

Q. At the bottom of that paragraph, if you look at the last sentence in that paragraph, tell me if I read this correctly. "My client has advised me that she would be happy to return to full duty if she could at this time, but, between now and the time that she fully recovers from the effects of her injury, she does want to make every effort to provide valuable services to your company." First, did I read that correctly?

A. You did read it correctly.

Q. And did you indicate, through your attorney, that you would be happy to return to full duty, if you could, at the time?

A. No. Not at that time.

Q. This is September 8, 2004, correct?

A. Correct.

Q. And did you indicate, through your attorney, between now and the time that you fully recover from the effects of the injury, you still

wanted to make every effort to provide valuable services to the company?

A. I never said that to the attorney.

Q. Did you ever say that to anyone?

A. No.

Q. Is what's stated in this letter simply incorrect?

A. It is. And, for the record, that's why he's not my attorney anymore.

Q. Do you recall when you fired him as your attorney?

A. No.

Q. At the same time that that letter was written, same day, actually --

MR. DWYER: Mark that as Exhibit 2.

(Document marked as Reis Exhibit 2 for identification)

Q. Mr. Farley wrote to the Beacon Mutual Insurance Company. (Hands exhibit to witness)

A. (Witness examines exhibit)

Q. Have you completed reading that?

A. Yes, I have.

Q. You would agree with me that both of the letters in Exhibit 1 and Exhibit 2 are dated the

same date, September 8, 2004?

A. Correct.

Q. In the letter to your employer, Mr. Farley was indicating that you wish to go back on a part-time basis in some limited capacity, correct?

A. That's what he says in the letter.

Q. And the second letter to the insurance company, he's indicating you're having flare-ups with your fibromyalgia, correct?

A. Correct.

Q. Are you familiar with the job duties that your job entailed, the formal job duties?

A. I haven't seen them in a long time.

MR. DWYER: Mark this as Exhibit 3.

(Document marked as Reis Exhibit 3 for identification)

Q. Could you take a look at that document as well.

A. (Witness examines exhibit with Attorney Costello)

Q. Have you completed that?

A. Yes.

Q. As of the date Mr. Farley wrote these two letters, one to your employer and one to your

A. No.
Q. Do you recall approximately when this meeting with Ms. Ceseretti occurred?
A. No.
Q. Do you need to take another break?
A. Not right now. Thank you.
MR. DWYER: Mark this as Exhibit 5.
(Document marked as Reis Exhibit 5 for identification)
Q. Miss Reis, do you recall giving a statement over the phone to Seth Starr from Amtrak about the incident?
A. Yes.
Q. Have you had an opportunity to listen to the tape of that conversation?
A. No, I read it.
Q. You read the transcript. Would you take a moment to -- when did you last read that document?
A. Just recently.
Q. When is "just recently"?
A. Within the last week.
Q. Do you recall having that conversation?
A. Yes.
Q. And that conversation occurred on July 2,

2004?

A. Correct.

Q. Is that how you recall it?

A. Yes.

Q. Having reviewed this document, do you believe it accurately transcribes your conversation with Mr. Starr?

A. Yes.

Q. I'd like you to turn to Page 3 of the transcription, if you could.

A. (Witness complies)

Q. Now, you understand I represent Amtrak, correct?

A. Correct.

Q. And that Mr. Starr is an employee of Amtrak, correct?

A. Correct.

Q. There is a reference to the fifth paragraph down to a Martha. Do you see that?

A. Yes.

Q. And she's an Amtrak employee as well?

A. Yes.

Q. And that would be Martha O'Neil, correct?

A. Yes.

Q. You indicate in this matter that the police officer with whom you spoke indicated that he would put in a report on it?

A. Yes.

Q. When did you talk to the police officer?

A. He wasn't a police officer. He was the security, the person that dragged me off the train.

Q. Was he Amtrak security?

A. I think so.

Q. What did he look like?

A. He was short, kind of short, heavy-set. I think he was balding.

Q. Do you recall what his uniform looked like?

A. No.

Q. And how did you get Martha's name?

A. I don't know. I guess I just called information for the Amtrak number and --

Q. Okay.

A. -- she was the one that answered.

Q. And you understood you were calling the Amtrak claims department?

A. Yes.

Q. And this was your first step to telling your side of the story to make a claim, correct?

A. That is correct.
Q. And what, as best you can recall, can you tell me what Martha said to you and what you said to Martha?
A. I am so sorry. I have no idea.
Q. Do you recall how long a conversation it was with Martha?
A. I don't remember. The only part that I do remember of that conversation is her telling me she wasn't the one that I needed to talk to; that she would give my name to the claim, the person who would be talking to me.
Q. And was that Mr. Starr?
A. Yes.
Q. Do you recall if Mr. Starr contacted you or if you contacted Mr. Starr?
A. I don't remember.
Q. Was there anything -- how many conversations did you have with Martha?
A. I don't know for sure.
Q. How many conversations did you have with Mr. Starr?
A. I don't know that for sure.
Q. Do you know if it was more than one for

either?

A. I don't know for sure.

Q. Was there anything said between you and Mr. Starr during that conversation that is not recorded in this transcription?

A. I don't know.

Q. Do you recall if Mr. Starr ever asked you for medical bills?

A. I don't remember that. I don't remember that.

Q. Was there ever any discussion of the payment of money by Mr. Starr, by Amtrak on the part of Mr. Starr or the execution of a release by you regarding your claim?

A. No. The word "release," I don't believe, ever came into the conversation. I think I remember Mr. Starr saying something like "we pay" -- he said something, something and then "we pay -- we would then pay worker's comp back."

Q. Okay?

A. Something like that.

Q. So at this point there was nothing more to this conversation with Mr. Starr that you were beginning the process of making a legal claim

against Amtrak?
A. Correct.
Q. If you could turn to the first page of the statement.
A. (Witness complies)
Q. Do you recall what time -- and you can refer to the transcript if you want to refresh your recollection. Do you recall what time the train was set to arrive?
A. In Providence?
Q. Yes, in Providence.
A. Oh, I know exactly. 9:50.
Q. Was it on time that day?
A. I think so, yes.
Q. Before I forget to ask you, did the train leave the station after you were injured before the rescue arrived to get you?
A. I think that it did, but I'm not 100 percent positive.
Q. Do you recall roughly how many people were getting on the train?
A. No.
Q. Was it busy? Crowded?
A. I had only walked through, just gotten to

the end of the quiet car. There might have been -- I don't know for sure. Ten.

Q. Okay. Where was the train going?

A. It was going to New York.

Q. You were getting off in New York. Do you know if it was arriving -- was that its end destination or was it going further south?

A. I don't know.

Q. As far as you were concerned it was going to New York?

A. Correct.

Q. What were you going to do in New York?

A. Going to a trade show.

Q. Which trade show was that?

A. I don't remember.

Q. You don't recall the client you were representing?

A. It was an association. It was an association trade show.

Q. I guess I never asked, what was your job? I don't understand how -- this was a private business, correct?

A. Correct.

Q. How did it make money? What was your job

A. Well, the two biggest ones for our industry was the National Tour Association Convention and the American Bus Association Convention.

Q. When would those conventions typically begin?

A. One was in November and one was in January, February. Something like that.

Q. Back to the incident. When you first got on the train, do you recall what number car you got on?

A. The number?

Q. Do you recall how many cars were on the train?

A. No.

Q. Do you recall did you get on closer to the end heading south or closer to the end to the north?

A. I got on the last car, which was the quiet car, which was -- I don't know. I know I'm in tour and travel, but I don't know if it was the northern end or southern end. It was as you get off the escalator, I mean, elevator.

Q. How many cars do you walk through before you fell?

A. Just one. I hadn't actually got -- I had

just about got to the end of it.

Q. So you fell between, somewhere between the quiet car and the next car, correct?

A. I fell into the vestibule, correct.

Q. I'd like you to look at your statement. If you could look at the 8th through 10th paragraph, the lettered paragraphs beginning "SS: Okay. Great."

A. Uh-huh.

Q. If you could just go down.

A. Yes.

Q. Can you just read that and tell me when you're done.

A. (Witness complies)

Q. Did you read that?

A. Uh-huh.

Q. Okay. Now, Mr. Starr asked whether you fell on a foreign object, correct?

A. Correct.

Q. You indicated that you don't remember that?

A. I didn't at that time.

Q. And that you indicated that you passed out a little bit? Well, that's what you indicated. My question is did you indicate that you passed out a

little bit?

A. Yes.

Q. Now, you also told Mr. Starr that you don't know if you tripped on the edge of someone's luggage or if your heel got caught as you were entering the vestibule. Is that what you indicated to Mr. Starr?

A. At that time, yes.

Q. Now, what would Amtrak have done wrong or negligent if you had gotten your heel caught as you were entering the vestibule?

A. I didn't get my heel caught. I know I didn't get my heel caught because when I was able to rethink and have time to think about how I fell and have someone go up into my bedroom to get the shoes that I wore and thought about "oh, I know how I can tell if I really got my heel caught or if I tripped over a bag, look at the shoes." When I was able to have someone go up and actually bring me the shoes, there was absolutely nothing wrong with those shoes. The heel could not have gotten caught, because there wasn't even a scratch on the heels. The heel was not coming off the shoe. The shoes were in absolutely perfect condition. I had just bought the shoes within two weeks prior to taking that trip.

Q. Well, you did tell him these shoes weren't high-heeled. Just regular heels, right?
A. Right. I'm just saying, there was nothing wrong with the heel.
Q. Who did you have go upstairs and get your shoes?
A. My son.
Q. How did the shoes get upstairs if you couldn't walk upstairs?
A. My son.
Q. So you took them back from the hospital, had your son bring them upstairs and they stayed there for two weeks?
A. Correct.
Q. And you indicated that you tripped on the edge of someone's luggage, correct?
A. Correct.
Q. When you were walking down the quiet car towards the vestibule, where were you looking?
A. Straight ahead.
Q. Did you see anything in the aisle?
A. I wasn't looking on the floor. I was looking straight ahead.
Q. And people -- this was in Providence, and

people were getting on the train, correct?

A. Correct.

Q. They were loading their luggage into the racks, correct?

A. Correct.

Q. And how long had the train been in the station between the time you entered the vestibule and walking down the vestibule to the time that you fell?

A. I didn't understand that question.

Q. You got on the train, correct?

A. Correct.

Q. You walked toward the end of the vestibule, and you fell sometime when you reached the end of that first car, correct?

A. Just before I got to the end of it, yes.

Q. How long were you on the train for before you fell?

A. Mere moments, you know. It was maybe to go from the window here (indicating) to the end, maybe the last chair. A little further than the last chair, maybe.

Q. So we're talking maybe 20, 25 feet?

A. About whatever that is. About that.

Q. Would you agree with me that the two points you're pointing out are about 20 to 25 feet apart?
A. Yes.
Q. And how long had the train been in the station before you fell? Were you one of the first ones on the car or last ones on the car, if you recall.
A. I think I was one of the last ones on the car. I got off the elevator and got right on the car. I don't know how long it had been down there on the tracks before I got down.
Q. How long did you have to walk from the elevator to the car that you were getting on?
A. I don't know.
Q. Seconds?
A. Yes. The door was pretty much diagonally across from the elevator.
Q. And when you said you got on the last car, was it the last car closest to Boston or the last car closest to New York?
A. Well, if the train was going this way to New York, and I got on the last car --
Q. Closest to Boston?
A. Closest to Boston.

Q. So prior to falling, you did not see any luggage in the aisle?

A. No.

MR. COSTELLO: Are you referring to the luggage that she fell over or any luggage at all in the car?

MR. DWYER: I guess she answered it.

Q. Did you see any luggage at all in the car when you got on the train in the aisle?

A. No. I was looking straight ahead. I was not looking on the floor.

Q. Do you recall other people in the aisle putting luggage up above and under their seats, getting ready to travel?

A. I do remember seeing one woman about the place where I fell facing me, putting something up in the luggage bin.

Q. Can you describe what this woman looked like?

A. No. I don't know for sure.

Q. Do you recall anyone else in the aisle, other than that woman?

A. No.

Q. Was there any Amtrak personnel in that car

when you got on the car?

A. No.

Q. There were no Amtrak personnel in that car?

A. No.

Q. Is that correct?

A. That is correct.

Q. How quickly were you moving?

A. I was just walking regular.

Q. Were you carrying anything?

A. I was. I had my purse and my briefcase on my shoulder, right shoulder. And then I was carrying my -- I was just going for an overnight. I just had a very small piece of luggage.

Q. Were you carrying that in one arm or dragging it behind you on rollers, that piece of luggage?

A. I don't remember because I don't remember which piece of luggage I took with me that time.

Q. Were you carrying anything in front of you? Was the luggage being carried in front of you or the side or back, if you recall?

A. It would be -- I don't know for sure.

Q. Was this woman on your left or your right?

A. She was on my right.

Q. How do you know that -- strike that.

How is it that you now believe that you tripped over her luggage?

MR. COSTELLO: Objection. I don't think there has been any testimony that she tripped over that woman's luggage.

MR. DWYER: I misunderstood. What luggage did you trip over?

A. A piece of luggage. A piece of luggage that was in the aisle as I was walking down.

Q. Oh, you don't know if it belonged to that woman or not?

A. I don't know for sure.

Q. Do you think it belonged to that woman?

A. What I do know for sure is this. I got almost to the end of the car and I fell over. I know I fell over something because I know I didn't trip because I know from the shoes. I know I fell over something because I was at almost the end of the car. This is the vestibule (indicating); this is the beginning of the other car (indicating). I ended up in this corner (indicating). My left side smashed into that corner. So I know --

MR. COSTELLO: For the record, she's

pointing to the left corner.

A. The left corner. So I know I had to trip over something and go airborne to go from being almost to the end of the quiet car and then end up on the ground on the other side of the vestibule smashed in the left-hand corner.

Q. Well, you said you know you tripped over something. How do you know you tripped over luggage?

A. Then I was going to tell you that the more I thought about what had happened, I do remember out of the corner of my ear hearing someone in a woman's voice saying "I'm sorry. Oh, I'm so sorry."

Q. To whom?

A. To me.

Q. And what did this woman look like?

A. I don't know.

Q. She wasn't an Amtrak person?

A. No. She wasn't an Amtrak person.

Q. This was a passenger?

A. Correct.

Q. So how do you know it wasn't her leg that you tripped over?

A. To be honest with you, I don't think I

would go airborne that far if I tripped on someone's leg.

Q. All right. You must have been traveling pretty fast to go airborne, though?

A. No, I wasn't. I was just walking regular. I couldn't go fast. I had two things on my shoulder. This was my briefcase that had my computer in it.

Q. How do you know you had two things on your shoulder? You said earlier you didn't know where it was.

A. I don't know if my suitcase, if it was a suitcase I was rolling or if it was a smaller suitcase that I have that I could just carry with my left hand.

Q. So what was it that you were carrying on the train with you? Your purse?

A. My purse, my briefcase.

Q. And a piece of luggage?

A. And a piece of luggage.

Q. Did you see any luggage in the aisle after the fall?

A. I was in the vestibule.

Q. So you don't know what you tripped on?

A. I believe it was a piece of luggage.
Q. You didn't see any luggage before you fell, correct?
A. I didn't see luggage. I was going straight forward. But as I tripped, I was right at the point of where this woman was standing, facing me, standing up in her seat or at her seat putting stuff up into the luggage compartment.
Q. But you didn't see any luggage in the aisle after you fell either?
A. I wasn't in the aisle. I was on the other side of the vestibule.
Q. Is it fair to say you didn't see what you tripped over, either before or after you fell?
A. I'm not going to -- I'm going to refuse to answer that question because I don't know for sure.
Q. You can't refuse to answer?
A. I don't know for sure. That's my answer.
Q. You don't know for sure what? You don't know for sure what you tripped on?
A. I believe it was a piece of luggage.
Q. Why do you believe that? You didn't see a piece of luggage before you fell, correct? Is my statement true? You did not see a piece of luggage

before you fell, true?

A. I don't know for sure.

Q. You didn't see a piece of luggage after you fell, true?

A. That's true.

Q. Assuming that it was a piece of luggage that you fell over, how would Amtrak be responsible for that? How are they liable for that?

MR. COSTELLO: Objection. You're asking her a legal conclusion.

MR. DWYER: I'm asking her a question that a jury would have to decide. I just want to know what she thinks my client did wrong in relation to the luggage that you think you may have tripped over.

MR. COSTELLO: I'm going to still object. You're not a legally trained person, but if you have an idea, if you know, you can answer. I object, for the record.

A. Legally I don't know. Being in the industry and traveling on planes, traveling on motor coaches, there are people, flight attendants, who as people are getting on, are going up and down the aisle making sure that the aisle is free of any

luggage, foreign objects, to alleviate anyone falling or hurting themselves as well as their pushing, helping passengers pushing things in so they don't fall out of the luggage.

Q. But not every airline passenger gets their own personal attendant, right?

A. That's not what I was saying.

Q. Well, if an airline attendant was assisting somebody with luggage in the front --

A. That's not what I said. I didn't say she was helping the specific passengers. She's walking up and down the aisle making sure that there is no luggage or any foreign object in the aisle so that anyone would trip or fall. She's also looking up as she goes up and down to make sure that things are not hanging out of the luggage compartment. She doesn't know who own it. She sees it. If it's hanging out, she sticks it in.

Q. How many times have you traveled on an Amtrak train?

A. Two or three times.

Q. Out of Providence?

A. Providence, yes.

Q. Anywhere else?

Costello)

Q. Miss Reis, this is a letter from your prior counsel in this case; is that correct?

A. Correct.

Q. Did you know he was sending a letter to Amtrak?

A. Yes.

MR. DWYER: Mark this as Exhibit 7.

(Document marked as Reis Exhibit 7 for identification)

A. (Witness examines document with Attorney Costello)

MR. COSTELLO: I want to speak to my client for a minute.

MR. DWYER: This is the middle of a deposition, counsel.

MR. COSTELLO: She has a right to consult with counsel. There is no question pending.

MR. DWYER: I think there is a question pending.

(No pending question found)

Q. Miss Reis, looking at what's been marked as Exhibit 7, is that a true and accurate copy of the bankruptcy petition that you filed in the United

States Bankruptcy Court?
A. Yes.
Q. And who represented you in that matter?
A. Attorney Jacquard.
Q. How did you decide to go to Mr. Jacquard?
A. He was referred to me.
Q. Who referred you?
A. Another attorney.
Q. Which other attorney referred you? Was it Mr. Farley?
A. No, John Reis.
Q. John Reis, is he any relation?
A. Yes, he is.
Q. Who is he?
A. My brother.
Q. Where does Mr. Reis practice?
A. He practices in Cranston.
Q. Okay. Can you turn to the third to last page on the document.
A. (Witness complies)
MR. COSTELLO: "...Compensation of Attorney?"
MR. DWYER: One before that. I'm sorry. Section 18.

Q. You see at the bottom there it says, "I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct"?

A. Yes.

Q. And you signed that?

A. Yes.

Q. And it's signed on April 18, 2005, correct?

A. Correct.

Q. If you turn to Schedule B, Personal Property, that would be the third page on Schedule B.

MR. COSTELLO: B6?

MR. DWYER: No, Schedule B. It's the third Schedule B.

Q. Do you see No. 33, "Other personal property of any kind not already listed. Itemize." Do you see that?

A. Yes.

Q. And you listed your worker's comp claim as a result of work on 6/2004, correct?

A. Yes.

Q. That's the incident which gives rise to

your claim against Amtrak, correct?

A. Correct.

Q. You indicated that the value there was unknown, correct?

A. Correct.

Q. Any reason why you didn't list the claim against Amtrak?

A. Because at that time it wasn't formally in litigation. At that time we didn't even know if we were going to go to litigation with Amtrak.

Q. Okay. Where did you get that understanding that your claim had to be currently in litigation in order to be listed as, listed on your bankruptcy petition?

MR. COSTELLO: I'm going to object and instruct you not to answer that because clearly it gets into attorney-client privilege.

Q. Would you agree with me nowhere in this bankruptcy petition is this claim against Amtrak identified?

A. No; that is correct.

Q. If you go back to the page prior, personal property, No. 20.

A. (Witness examines page)

Q. "Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor and rights to setoff claims. Give estimated value of each." You indicated in that document there were no such contingent or unliquidated claims, correct?
A. Correct.
Q. Do you think it was important that you verify the information that you provided to the bankruptcy court?
A. I don't understand the question.
Q. Did you think it was important that you verified the answers in your bankruptcy petition to the bankruptcy court?
MR. COSTELLO: I'm going to object. There is no evidence that she didn't verify.
Q. Did you verify that you had no contingent or non-contingent interest -- excuse me -- that you had no other contingent or unliquidated claims of every nature before you signed this petition under penalties of perjury?
MR. COSTELLO: Again, I'll instruct you not to answer and move to strike whatever she did say at that point because it involves discussions with her

former attorney.

MR. DWYER: No. It's just to verify. Did she verify?

A. Well, if she answers the question, she's going to have to discuss or verify that she discussed it with somebody. And obviously you're talking about an attorney.

MR. DWYER: She has to verify this stuff herself. She's signing it.

MR. COSTELLO: She's signing it with the assistance of an attorney. Clearly, she's listed the claim as hurt foot, broken foot. She's not trying to hide the claim. Whether it included another possible defendant, I think that's something that goes between her and her attorney at that point.

Q. Well, on Schedule C, which is two pages away, you listed the worker's comp claim as "exempt," correct, "Schedule C. Property Claimed as Exempt." You listed the worker's comp claim as exempt, correct?

A. Yes. My attorney did that.

Q. Do you know why Mr. Jacquard was recommended to you by your brother?

A. Because he has done bankruptcy; he had a knowledge of bankruptcy court.

Q. Do you know how long Mr. Jacquard has practiced in bankruptcy?

A. No.

Q. What did your brother tell you about Mr. Jacquard's abilities?

A. He said he had high abilities.

Q. Have you ever made any effort to seek to reopen the bankruptcy to identify this claim to the bankruptcy trustee?

A. No.

MR. DWYER: Take a two-minute break.

(Recess taken)

BY MR. DWYER:

Q. Did Mr. Jacquard tell you not to list the claim against Amtrak or potential claim against Amtrak in your bankruptcy petition?

MR. COSTELLO: Objection. Move to instruct the witness not to answer on attorney-client.

Q. Did you tell Attorney Jacquard about your potential claim against Amtrak?

MR. COSTELLO: Again, I object and instruct the witness not to answer the question on the

grounds of attorney-client privilege.

Q. Do you know if Mr. Jacquard spoke to Mr. Farley?

A. I have no knowledge.

Q. Do you agree with me you didn't claim the lawsuit against Amtrak as exempt, is that true, in the bankruptcy case?

A. Correct.

Q. Do you recall when the bankruptcy was discharged? It's if you recall. If you don't, it's in the record.

MR. COSTELLO: For the record, the document you've given her indicates July 25, 2005.

Q. You indicated earlier in your deposition that an Amtrak personnel dragged you from the train. Do you recall stating that?

A. Correct.

Q. Can you tell me what happened from the time you fell while you were lying in the vestibule to the time the rescuer arrived?

A. I was on the floor with my right leg under my left, pushed my left side of my body, pushed into the left side of the vestibule. When I opened my eyes, all I saw was a bar, a metal bar. And I tried

to get myself up on that metal bar and I couldn't. And an Amtrak conductor or whatever he was, a big man, boisterous voice, had a uniform on, was screaming at me over and over again, "Lady, what are you going to do? Are you going to stay on or get off? We have to get this train moving." I remember saying, "Just give me a minute." And I tried again to pull myself up on that bar. And he must have screamed that at me three times. Each time I tried to get myself up and I couldn't. He then had the door open to the platform. And he took my things and threw them out on the platform.

Q. Threw them or placed them out?

A. He threw them out. And the security guard that was down on the platform took me by my wrist and dragged me off the train. There was no place to sit. He said the best he could do was the ground. And I said I couldn't get down to the ground, plus I had a dress on. So I stood there with my right elbow on his shoulder with my right foot dangling until rescue got there, which was about ten minutes.

Q. Did any physician ever tell you that the dangling of your foot outside of the Amtrak station further harmed your foot beyond what occurred in the

fall?

A. Yes.

Q. Which physician told you that?

A. The physician at the Rhode Island Hospital emergency room and also Dr. DiGiovanni -- oh, no. I'm sorry -- Dr. Polumbo, Dr. Mark Polumbo.

Q. What do you recall, as precisely as you can, what Dr. Polumbo said about your foot dangling outside of the station?

A. Something to the effect that "I can't believe they moved you. They should have never moved you. No one should move an injured person before medical help gets there. Probably with your foot the way you say it was for ten minutes, it made things worse." Something to that effect.

Q. Did he tell you how he could tell that something, that your foot was made worse without having seen an x-ray or seen you between the time you fell and the time you were dragged off the Amtrak train?

A. No. This was after the x-rays.

Q. Oh, no. I know. Did he tell you -- your x-rays were taken at Rhode Island Hospital, correct?

A. Correct. And then Dr. Polumbo did more

x-rays the week after that.

Q. Right. And did he tell you how he could tell that the condition of your foot was made worse by Amtrak moving you and having you stay on the station when he didn't have any x-ray or examination between the time you fell and when you were standing in the station?

A. By the way I explained how it happened to him and then how I dangled the foot, it was about all of the torn ligaments in my foot. I just didn't break the bones, that all the ligaments were also torn.

Q. Did he tell you that the ligament damage occurred at the fall or after the fall when you were standing at the station?

A. No, he didn't tell me that.

Q. How about the doctor at Rhode Island Hospital? What did he say about the foot dangling in the station?

A. Pretty much the same thing Dr. Polumbo said.

Q. And did he tell you how he was able to tell that there was further damage done between the time you fell and while you were standing in the station,

ER doctor?

A. I don't remember him specifically saying.

Q. Can you describe the pain that you felt at that time?

MR. COSTELLO: At what point are we talking about?

MR. DWYER: The time she fell.

A. I was in agony.

Q. On a scale of 1 to 10.

A. It was over 10.

Q. Do you think you passed out?

A. I don't know for sure.

Q. And do you recall if the train left the station before the rescue squad arrived?

A. I don't know that for sure. I think it did, but I don't know for sure.

Q. How long were you on the floor of the vestibule after the fall?

A. I'm going to say -- I don't know for sure. I'm going to say that it was maybe about two to three minutes.

Q. Can you describe the first Amtrak personnel that came out to you and told you you had to get off the train? What did he look like?

A. I was down on the ground. I didn't see -- I don't remember seeing his face. I just know that he had a deep voice and he was loud. He was talking to me in a very loud tone, very loud voice.
Q. The train departed at 9:50 a.m., correct, or was arrived at 9:50 a.m., correct?
A. No, it was departing at 9:50.
Q. And the quiet car is well-lit, correct?
A. I don't know that for sure.
Q. Did you have any trouble seeing on the day of the incident?
A. No.
Q. You indicated in your statement that an Amtrak employee brought you a wheelchair, correct?
A. They brought me a wheelchair. Somebody brought me a wheelchair mere moments before the rescue got there.
Q. How long were you on the train station platform before the rescue got there?
A. Ten minutes.
Q. How long did it take them to -- I take it they load you on a stretcher?
A. Correct.
Q. How long did it take them to get you onto

the stretcher and into the ambulance?

A. I don't know. I don't remember being down there once they got there very long. Two minutes, maybe three minutes.

Q. And how did you feel upon arrival at the hospital?

A. The same as I did before.

Q. Which was?

A. I was in agony.

Q. How long were you in agony? When did the pain start to dissipate?

A. I guess once I started taking some pain medication.

Q. Do you recall falling a couple of days after the incident on the Amtrak train?

A. No.

Q. Did you fall off a chair?

A. No.

Q. You don't recall going to Rhode Island Hospital on the 27th?

A. Yes, I do. I do remember going.

Q. That was after, a couple of days after?

A. Correct.

Q. Why did you go?