# EXHIBIT A

Volume I
Pages 1 to 53
Exhibits 1 to 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ELIZABETH A. REIS,
Plaintiff,

vs.

NATIONAL PASSENGER RAILROAD CORPORATION, A/K/A NATIONAL RAILROAD PASSENGER CORPORATION,
Defendant.

Civil Action No. 07-236S

DEPOSITION OF ROBERT B. JACQUARD, a witness called on behalf of the Defendant, taken pursuant to the Federal Rules of Civil Procedure, before Grant D. Hackett, Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on Tuesday, May 6, 2008, commencing at 10:43 a.m.

PRESENT:

Flaherty, Butterfield & Costello
(by Frederick A. Costello, Esq.)
33 College Hill Road, Suite 20D, Warwick, RI 02886, for the Plaintiff.

Edwards Angell Palmer & Dodge, LLP
(by Paul E. Dwyer, Esq.)
2800 Financial Plaza, Providence, RI 02903-2499, for the Defendant.

* * * * *

# ATTORNEY NOTES

**January 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

**February 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | |

**March 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

**April 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | | | |

**May 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

**June 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

**July 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

**August 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**September 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

**October 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

**November 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | | | | | | |

**December 2008**

| Su | Mo | Tu | We | Th | Fr | Sa |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

# I N D E X



| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ROBERT B. JACQUARD | | | | |
| BY MR. DWYER | 3 | | | |
| BY MR. COSTELLO | | 44 | | |



* * * *

# E X H I B I T S



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of taking deposition | 4 |
| 2 | Discharge of Debtor document | 12 |
| 3 | Affidavit | 17 |
| 4 | Letter with Michael J. Farley letterhead, dated 12/1/04 | 24 |
| 5 | Affidavit of Elizabeth Reis in Opposition to Defendant's Motion for Summary Judgment | 27 |



* * * *

P R O C E E D I N G S

ROBERT B. JACQUARD

a witness called for examination by counsel for the Defendant, having been satisfactorily identified by his counsel and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. DWYER:

Q. Attorney Jacquard, my name is Paul Dwyer. I represent Amtrak in a case brought by Elizabeth Reis, a former client of yours, in the Federal District Court here in Rhode Island. Amtrak filed a motion for summary judgment. And as part of the opposition, the Plaintiff filed her own affidavit, an affidavit from you, and we're here to ask questions regarding those affidavits in your representation of Elizabeth Reis in the bankruptcy proceeding.

Let me first ask you, you're here in response to a deposition subpoena and notice served upon you?

A. Yes.

Q. As part of that deposition subpoena, it asks that you bring, essentially, your file relating

to Elizabeth Reis. Did you bring that with you today?

A. No, I didn't.

Q. Why is that?

A. I thought it would be easy to find. I keep a list on my computer of my closed cases, and it's several pages long. I went through it last night and again early this morning; was unable to locate her name on it, so I'm unable to figure out exactly where it was stored. So I would at least have to go and do it by hand, go through the boxes from that period of time.

Q. Okay. We have a motion for summary judgment with a hearing scheduled for May 12th. We've asked for continuance of that hearing date. But I would ask if you could look through it this week and get back to us Thursday or Friday --

A. I will.

Q. -- it will be greatly appreciated.

MR. DWYER: Let's mark the deposition notice and subpoena as Exhibit 1, please.

(Document marked as Jacquard Exhibit 1 for identification)

Q. What was the scope of your representation

of Elizabeth Reis?

A. I filed bankruptcy for her, Chapter 7.

Q. And do you recall what Ms. Reis looks like?

A. Yes. She's, I believe, probably around late 40s, dark hair, a little on the short side; medium height and build.

Q. You would recognize her if you saw her?

A. I think so.

Q. Had you represented Ms. Reis in any other matters?

A. No.

Q. How did she come to your office?

A. She is Attorney John Reis's sister. John has an office on Park Avenue in Cranston. He's with David Migliosi, and they have referred a few bankruptcy cases to me. And I'm not sure whether she got my number from her brother or whether her brother initiated a phone call to me first.

Q. Do you remember meetings with Ms. Reis? Do you remember any specific meetings with Ms. Reis?

A. Yes.

Q. Would you characterize your recollection of your representation of Ms. Reis as good, as you don't have the file here?

A. Yes. It was fairly routine.

Q. Did you represent her in any -- did you render any legal advice regarding any criminal matter involving Ms. Reis?

A. No. I don't recall anything like that.

Q. Did you advise, provide any legal representation or provide any legal advice -- let me rephrase that. That's a bad question.

Did you provide any legal advice to Ms. Reis regarding any worker's comp matter she had?

A. No. I did ask her questions about a case that she told me she had.

Q. How about did you render any legal advice regarding any potential claim she may have had against Amtrak?

A. No. I did inquire further about the worker's comp claim, as I do on all cases when something like that is brought to my attention. When the person has a worker's comp claim, it's extremely routine for me to then inquire as to whether or not there is any possibility of a third-party claim.

Q. Do you recall how many times in the course of your representation you would have met with

Elizabeth Reis?

A. Sure. I would have had one initial consultation in which I take some information from her, make sure she's qualified for bankruptcy. I explain the bankruptcy process to her and then give her a price and, you know, basically explain to her that the consultation is free and that should she wish to go forward at anytime with the bankruptcy, how to contact me and what I would need to put the bankruptcy together to go forward.

Q. I mean, you've had many cases since Ms. Reis's case?

A. Uh-huh.

Q. Are you testifying as to your general practice or what you particularly remember about Ms. Reis?

A. Both. My general practice -- I remember slightly her talking about the worker's comp case.

Q. Okay. Would any discussions be reflected in notes that you maintained in your file?

A. I would have -- on pretty much every case, actually, I have an example in here that I just came from court with. I start out, I do my note-taking on a yellow piece of legal pad, and I take some

general information and yes, I would have made a note about the worker's comp case as being property that she has, that she possesses.

Q. Would Elizabeth Reis fill out any paperwork at that initial consultation?

A. No, I don't do that. I ask my own questions; take my own answers.

Q. How long is that initial consultation, approximately?

A. About 25 minutes.

Q. Thereafter she retained you as her bankruptcy counsel, correct?

A. Yes.

Q. Would there be subsequent meetings?

A. She would drop, typically drop off her bills and any mortgage information or car loan information she may have, her tax return and pay stubs. I would put the petition together. We'd set another date and time for her to come in. I would go through the petition with her one page at a time and explain it to her, get her signature in the appropriate places, take a payment from her at that point and file the case.

Q. Okay. At anytime would she have made a

writing to you in that process that you just explained?

A. No.

Q. Is she sitting by your side while you're preparing the petition or are you just doing that from the information?

A. Across from me, from my desk.

Q. After you filed the bankruptcy petition, when would be the next time that you would have met with Elizabeth Reis?

A. Well, if she has any questions along the way, she could call me. I think I do recall taking quite a few questions from her from time to time over three or four or five-month period about various things, you know, phone calls, return the phone calls. The next time I would see her for certain would be at the meeting of the creditors, which is generally about a month after you file.

Q. And not being a bankruptcy attorney, can you tell me generally what happens at the meeting with the creditors?

A. Sure. Myself and Ms. Reis would meet with the trustee assigned to the case, who in this case was Attorney Andrew Richardson. Start out by

checking her ID and proof of Social Security number to make sure she's the one that filed it. He would show her her signature and ask if she's the one that filed the case. Then he would go through the petition. Typically, I believe she owned real estate. He would ask, "You own this real estate and you say it's worth such and such an amount. What do you base that on?" She might answer him, "Well, it seems to be what things in the neighborhood are selling for" or whatever reason she has for believing that's what her house is worth, what she put in the petition. Then he would read off her property that she listed. And pretty much on every case the next question after reading off the property is something to the effect of, "Do you own anything else other than what's listed here, or is this all the property in the world that you own?" I'll let you ask the next question.

Q. Is she under oath at that time?

A. Yes.

Q. Is she put under oath initially by the court officer or trustee?

A. Trustee.

Q. The entire interview is done under oath?

A. Yes.
Q. Will questions also be put to you as her counsel by the trustee?
A. No. Generally, she's required to answer all questions, and I'm not entitled to testify unless the trustee wants something, some information from me. But no, it's her testimony.
Q. Are there opportunities for you to raise an objection?
A. No. Any questions related to her financial condition can be asked, so I've never had a case where questions were not related to the person's financial condition. I have no reason to object.
Q. After the meeting with the trustee, what would be the next, what is the next step in the bankruptcy, in Elizabeth Reis's bankruptcy?
A. Sure. The case closes up on its own about three months from the day that the case is opened. The discharge is issued. And the discharge being the order from the Court, basically, that the person is no longer responsible for their debts. Maybe a couple of weeks after that the clerk of the court will close down the case.
Now, I believe this was a case that was

filed before the changes in the bankruptcy law.

Q. Why don't we ask you questions about this (indicating).

MR. DWYER: Mark this as Exhibit 2.

(Document marked as Jacquard Exhibit 2 for identification)

Q. I've marked as Exhibit 2 materials from the United States Bankruptcy Court which would include her petition. Could you please explain to us, first, what these documents are, individually, if possible.

A. Okay. The first page is what I referred to before, the discharge of the debtor. That was issued about three months after the filing of the petition.

Q. What is the effect of the discharge?

A. Basically an order of the Court, that the person is no longer responsible for their debts with the exception of any debts that would have been, if there was an objection to some of the debts that were sustained. No objection was filed by any of her creditors. If there was student loans or non-dischargeable tax debts, those would remain.

Q. Are worker's comp liens dischargeable in

bankruptcy?

A. Well, as it relates to the individual, yes. But the lien still runs with the case, as I understand it. So the person isn't personally responsible for it, however, the case itself is responsibility to pay off the lien.

Q. I see, okay. Then there is a certificate of service. Is that also part of the certificate of service of the order?

A. Yes. This is generated by the Bankruptcy Court.

Q. Then on the third page there is what's titled, "Re-affirmation Agreement." What is this document?

A. By the act of filing the bankruptcy, the person is relieving themselves of their obligation to pay off all debts, including mortgage or car loans. In this case -- so typically the creditors ask that in exchange for the person, the debtor, keeping the property, either the car or house, they sign what is called a re-affirmation agreement. By signing the agreement and having it approved by the Court, the person is legally taking on the debt once again and is responsible for it.

Q. What debt did she take on by signing this re-affirmation agreement?

A. This is...

Q. Is that her mortgage or a car?

A. Yes. This is for her car. So yes, it's her car loan.

Q. Okay. And then, I guess --

A. I notice that it's dated 5/23/05, which is the same date of the meeting of the creditors. I must have had this in my possession at that time. When I met with her at 10 Dorrance Street, got a signature on the document then.

Q. Okay. What is the next document entitled, "United States Bankruptcy Court, District of Rhode Island"?

A. This is also generated by the Bankruptcy Court. This is the notice to creditors and other interested parties that the person has filed a bankruptcy and also any pertinent information about the case, such as the time of the meeting of the creditors. And there is also notice that there is a stay against her creditors for collection activities.

Q. Okay. And the next document is what?

A. This is the first page of the voluntary petition, which I would have put together.

Q. And is the remainder of the document portions of the voluntary petition?

A. Yes.

Q. Do you recall discussing with Elizabeth Reis that she would be signing that document under pains and penalties of perjury?

A. I don't know if I -- I don't typically use the term a lot, "pains and penalty of perjury." I do tell my clients that it's extremely important that they answer the questions on the petition thoroughly, especially as it relates to property. I typically state to my clients, I always do, that it's very important to tell the Court what all of your property is. And if there was any chance that you were going to lose some property as a result of filing a bankruptcy, I would be able to spot it if they were honest with me and told me everything they had for property.

Q. Do you tell your clients what is meant by "property" under the law?

A. Yes.

Q. What is meant by property under the

bankruptcy law?

A. Well, I first go through, I ask about individual pieces of property. I ask them first about their real estate. If they own real estate at the time, I then ask them specific questions about that. I also inquire about any other real estate they've owned in the previous five years. Then I ask them about any cars or vehicles they own. Then I inquire about any cash they may have on hand, any accounts whatsoever they have on hand in any bank or financial institution, checking accounts, 401Ks and so forth. I inquire about their furniture, clothing, jewelry, whether they have any life insurance policies.

I ask these questions in that order so that I'm certain in my mind I did not miss anything. And then I follow up with, I say, "Do you own any other property whatsoever?" And then I follow that up with, "Do you have any claims against anyone or do you have a right to sue anybody for any money or have you been in any accidents in the last three years in which you may be able to sue anyone?"

Q. Did you ask Elizabeth Reis that question?

A. I don't specifically remember it, but I

know I ask it in every single circumstance. It's so important to do that because my clients are going to be pretty upset at me if they lose a piece of property. That's probably the thing they're most concerned with when they file bankruptcy. I tell them, "If you want me to be able to advise you properly, you need to tell me everything that you have, everything that you own. I stress that. And then at the end -- I follow it in that order. At the end I ask about any lawsuits they may have.

Q. She told you about the worker's comp matter that she had?

A. Yes.

MR. DWYER: Let's mark as Exhibit 3 Attorney Jacquard's affidavit, please.

(Document marked as Jacquard Exhibit 3 for identification)

Q. Sitting here today do you have a recollection of what she told you about the worker's comp claim?

A. There is one thing I do remember about it.

Q. What is that?

A. Well, I remember her telling me she had a worker's comp claim. And I asked her, "How did you

injure yourself?" And I remember her telling me that she fell. And I don't know necessarily if I recall that it was on a train or anything like that at this point because it was a couple of years ago. I then inquired of her, you know, whether there was any possibility there may be a third party at fault and whether she may possess a third-party action.

Q. What did she say to you?

A. She said no. I know she told me there wasn't. I know that I felt very certain that she was certain that she didn't possess any third-party action.

But what I remember about it was her sort of pushing back from the table and looking down at her feet and sort of motioning down there and explaining that she fell. I remember her doing that. Beyond that, you know, I knew it was a fall, and I don't remember exactly what was said. I'm certain that I would have inquired further as to whether there was any possibility that a third party may be responsible that she could sue.

Q. Would the substance of that portion of the conversation as to whether or not she had any rights against third parties be reflected somewhere in the

notes in your file?
A. If she said she possessed it, I would have written a note down there that she had a personal injury claim.
Q. Do you recall what she told you as to how the accident occurred for which she received worker's comp?
A. The only thing I remember was that it was a fall, to be honest with you.
Q. If you could look at your affidavit. Take a moment to read that.
A. (Witness complies) I remember it.
Q. Okay. In the last -- did you ever advise Ms. Reis that she did not have a potential claim against Amtrak?
A. No.
Q. Do you recall her stating at any meetings to you at anytime during the course of your representation that she tripped and fell over a passenger bag in the aisle of the Amtrak train?
A. I don't recall what it was at this point that she said she tripped over.
Q. Would it refresh your recollection if I indicate that she also stated that after she tripped

and fell she was removed from the Amtrak train by her wrist by Amtrak personnel and had to stand with her foot dangling for some period of time thereafter until people from the emergency room came? Does that refresh your recollection as to whether or not you were told that?

A. No. I read her affidavit. I don't recall her stating any of that stuff.

Q. Do you recall if Elizabeth Reis told you that as a result of being pulled off the train and having her foot dangling, she was told by the emergency room physician and her treating physician, Dr. Palumbo, that further damage beyond the fall was caused to her foot?

A. No. I don't recall her saying that to me.

Q. If you had been told by a client that she had been pulled from the train by Amtrak personnel and that as a result of being pulled and having to stand there a physician told her that she suffered further damage to her foot beyond the fall, would you have advised her she may have a potential claim against the employer of the people who pulled her off the train, such as Amtrak?

A. I don't know, to be honest with you. I

don't practice personal injury. I suppose I would. And if I have a doubt about it, it is my practice to list in Schedule B of the petition potential -- I often write "potential personal injury claim."

Q. You're associated with the Gemma Law Offices?

A. Yes.

Q. And they're well-known personal injury attorneys?

A. Yes.

Q. If you have a question regarding whether someone might have a potential personal injury claim regarding their bankruptcy petition, but you're not sure, is there anyone at Gemma that you consult with?

A. I could ask any of the lawyers --

MR. COSTELLO: I object to the question. I don't believe he worked at Gemma at the time this bankruptcy was filed.

Q. I'll rephrase the question.

At the time of the Reis bankruptcy filing, were you working at Gemma Associates or associated with them in any way?

A. I went there in June of '05, so no. I

would have met with Ms. Reis originally at my Park Avenue office.

Q. If you had a question regarding whether or not someone had a potential personal injury claim, was there a particular personal injury attorney that you would consult with before you joined Gemma?

A. That was Seth Perlmutter's office. I could ask him about it, sure.

Q. That would be your practice if you had a question regarding a personal injury claim?

A. Yes. I mean, I probably surmise she tripped over her own two feet or tripped over something that was not out of place or something like that. Nothing in what she told me led me to believe she had a personal injury claim against anyone or that she believed that she did.

Q. Did she tell you that she had contacted Amtrak and given a statement on the phone in June of, in July of 2004?

A. I don't recall her saying that.

Q. Did she advise you that her worker's comp attorney had contacted Amtrak in December of 2004?

A. I don't recall her saying that either. And also, I think that the whole discussion about this

worker's comp issue only lasted a very short period of time. Some of the things you're saying would have taken her a long time to explain. I don't recall any long conversations with her about this whatsoever.

Q. When you were asking a client about the circumstances of a worker's comp claim, how detailed do you get with your questions, generally?

A. As detailed as possible until I feel satisfied.

Q. So you do not rely upon a lay person, such as Elizabeth Reis, saying, "Oh, no, I don't have any third-party personal injury claims arising from this worker's comp matter." You make that judgment for yourself based upon the facts relayed to you by the debtor, correct?

A. I would say, "How did the accident happen"; have it explained.

Q. Once it's explained to you, you make your judgment based on the facts you're told by the debtor, correct?

A. That is correct.

MR. DWYER: Mark this as Exhibit 4.

(Document marked as Jacquard
Exhibit 4 for identification)
Q. I'm going to show you a letter marked as Exhibit 4, signed by Michael Farley, directed to Seth Starr at Amtrak and ask if you've ever seen that letter before?
MR. COSTELLO: Is that the letter of December 4th?
MR. DWYER: December 1.
A. (Witness reviews exhibit) I don't recall that at all.
Q. Do you know if that's part of your file?
A. It could be. I don't recall it at all. I doubt it. Even there, there is nothing in this that would have led me to believe otherwise that she had anything other than a worker's comp claim.
Q. She was already on worker's comp, right, at the time?
A. Whether or not she was collecting or not, I don't know. I didn't investigate it. She told me she had a worker's comp claim.
Q. Okay. At the time -- as a worker's comp -- strike that question.
A. There is actually a way to check here. I

could look at the...

Q. Sure. Tell if she was collecting --

A. Yes. She was collecting worker's comp at the time.

Q. So at the time Mr. Farley wrote that letter, December 1, 2004, she was already collecting worker's comp, correct?

A. In 2004? I don't know. At the time of the filing of the petition I note that she was collecting worker's comp. That was her source of injury. Actually, there is a notation on Schedule I, also --

Q. Yes.

A. -- that I wrote in there.

Q. Where does that say?

A. At the bottom there is a question that says, "Describe an increase or decrease of more than ten percent in any of the above categories" -- of income, naturally -- "...anticipated to incur within the year of the filing of this document." My notation was, "Debtor injured while working for Providence Warwick Visitors Bureau. Only income is now worker's comp and disability insurance" meaning basically, yes, her income is subject to change

because she went from being employed to on worker's comp.

Q. Okay. In your experience, would you know why a worker's comp lawyer whose client was already receiving worker's comp benefits would write a letter to a third-party entity requesting information?

A. No, I don't. I honestly don't have a lot of knowledge of worker's comp. What I do know about it is that it's more of a no-fault system. She may have tripped over her own two feet and still be entitled to worker's comp benefits. That is the big difference between that and a personal injury claim. My knowledge doesn't go too much farther.

Q. That would be a claim against her employer, correct?

A. Or her worker's comp, her employer's worker's comp insurer.

Q. And you understood, I guess, in December of 2004, that Elizabeth Reis was not employed by Amtrak nor was she employed by the worker's compensation insurer, correct?

A. Correct.

Q. Now, you indicated before that you had

reviewed Elizabeth Reis's affidavit?

A. Uh-huh.

MR. DWYER: Mark that as Exhibit 5.

(Document marked as Jacquard Exhibit 5 for identification)

Q. Have you had the opportunity to review prior to this deposition Elizabeth Reis's affidavit?

A. I read it.

Q. When did you read Elizabeth Reis's affidavit?

A. Sometime last week. I noticed that it was attached to her subpoena, and I hadn't noticed it before that.

Q. How is it that you came about drafting your affidavit in this case?

A. I talked to Mr. Costello about the issue, and he explained to me the issue that's arising in her motion for summary judgment. I felt, you know, very strongly about how I conduct these interviews, the questions I ask. And I felt that I could put together an affidavit that is absolutely truthful that relates to the case.

Q. When were you first contacted by Mr. Costello to prepare that affidavit?

A. It might have been a month ago. I'm not sure. Actually, more than that, obviously. Two months ago or so.

Q. Did you have your file with you to review prior to executing that affidavit?

A. No.

Q. Do you execute this affidavit based solely upon your memory?

A. Yes.

Q. You indicated earlier in your testimony that there were things in this affidavit which Ms. Reis did not tell you; is that correct?

A. I don't recall that. Oh, in this affidavit? Yes. I don't recall her ever telling me a lot of these things, no.

Q. Can we go through paragraph by paragraph whether or not you recall what she told you. And I'll direct your attention to certain paragraphs.

Looking at Paragraph 2, what material in Paragraph 2 of Elizabeth Reis's affidavit did she tell you?

A. I'm sure she told me that she was on, slipped on a train. Other than that, I don't recall anything like her mentioning "business trade show"

or anything like that, where she was going.

Q. And how about in Paragraph 3? What, if anything, did she tell you that's reflected in Paragraph 3?

A. I just recall her saying that she fell. I don't remember any other details about it.

Q. Okay. And how about Paragraph 4? Did she mention anything that's reflected in Paragraph 4 of her affidavit?

A. I don't remember what she said her injuries were.

Q. And how about in Paragraph 5? At the time of your representation of Ms. Reis, did she tell you any of the material reflected in Paragraph 5 of her affidavit?

A. I don't recall her saying that stuff to me, no. I wouldn't have -- I would have been focusing her attention on how she felt, probably. To be honest, if she -- I don't recall her going in that direction at all. If she did, I would probably be trying to focus her attention on how she fell more than the fact that they wanted her to get off the train, to be honest.

Q. How about Paragraph 6? What was --

A. I don't recall her necessarily saying those words to me, no.

Q. How about regarding Paragraph 7? What did she tell you that is reflected in Paragraph 7 of her affidavit?

A. I don't recall her saying anything about that. As I said, I would have been focusing my attention on how she felt, what caused her to fall.

Q. How about in Paragraph 8? Did she tell you anything in Paragraph 8?

A. I don't recall anything.

Q. How about in Paragraph 10 of Ms. Reis's affidavit? Did she indicate anything about Paragraph 10?

A. I don't recall that at all.

Q. In Paragraph 11 did she ever tell you that she called -- strike that.

What parts of Paragraph 11 in Ms. Reis's affidavit did she tell you at the time of her representation?

A. I don't recall any of that.

Q. You don't recall her telling you that she had contacted Amtrak and Boston shortly after the incident?

A. I don't recall her telling me that.
Q. How about in Paragraph 12? What did she tell you that's reflected in Paragraph 12 of her affidavit?
A. I don't recall her telling me any of that either.
Q. In paragraph 13, did she tell you anything reflected in Paragraph 13 of her affidavit?
A. No. I don't recall her telling me that.
Q. Did she tell you that Mr. Farley represented her in the worker's comp claim?
A. Yes.
Q. And that's reflected, actually, in the petition, correct?
A. Yes.
Q. And did you contact Mr. Farley to discuss the circumstances of the worker's comp injury?
A. No.
Q. Would that be unusual for you to do?
A. No. It's not unusual. I don't recall --
Q. Let me rephrase that. That's a bad question.
Would it be unusual for you to contact the debtor's worker's comp attorney to learn about the

facts of the worker's comp claim?

A. No.

Q. Is there a reason why you didn't here?

A. I'm sorry. I think I gave you the wrong answer.

Q. That's fine.

Would it be unusual for you to contact the debtor's attorney regarding the facts surrounding the worker's comp claim to determine whether or not there might be a third-party claim?

A. Yes.

Q. So you did not contact Mr. Farley regarding Elizabeth Reis's claim?

A. No.

Q. How about Paragraph 14? Did Ms. Reis tell you anything that's reflected in Paragraph 14 of her affidavit?

A. She may have -- no, I'm sorry. In Paragraph 14, no, I don't recall any of that.

Q. How about Paragraph 15? Did she relate anything of substance that's reflected in Paragraph 15 of her affidavit?

A. That sounds like something more that she would have told me and I would have inquired about

because it's more relevant, you know, whether Mr. Farley told her that she had a third-party claim against Amtrak. So I don't recall that specifically, but that would have been a logical thing to ask.

Q. I'd like to have you look closely at Paragraph 20 of Elizabeth Reis's deposition. If you could just read that.

A. (Witness complies) Okay, read it.

Q. Okay. You would have been in the same room when she was filling out her forms for bankruptcy?

A. No. She gives me the information I need to fill them out, and then I present them to her and go over them one page at a time. If any changes need to be made because she doesn't agree with what was written in them, I'd have my computer right by my side to make the changes, reprint that page and then substitute it to make sure it was correct.

Q. So she didn't fill out the forms herself?

A. No. It's me that does it, yes, based on the information she gives me. As I said, I go through the petition one page at a time to make sure to explain it, to make sure everything is correct in it. It would be impossible for her to fill out the

forms. You'd have to use my computer.

Q. I'm just trying to figure out what she means by she "filled out the forms by your instruction."

A. (Witness shakes head)

Q. But she didn't?

A. No.

Q. Did she ever tell you she was not making a claim against Amtrak?

A. Definitely not. That would have alerted me that maybe she believes she has a claim and she's choosing not to make it. That would be a red flag with me. My belief at the time I filed this was that she did not possess a claim. I think that her -- my opinion is that she misspoke in Paragraph 20, that she actually believed she did not possess a claim, not that she had a claim and was not making it. Nothing -- if any client told me something to make me believe they had a claim but weren't possessing it, I'd explain to them, "You have no choice but to pursue that claim." It's property they possess, and the trustee would be interested in it. It would amount to a bad-faith bankruptcy filing to possess some property which they could

maybe pay their creditors with and not pursue it.

Q. What is the standard that you as a bankruptcy attorney applied in determining whether or not to list a potential third-party claim?

A. If there is any belief at all that it may be a colorable claim, it's listed. I've had many petitions where I've listed "potential personal injury claim" or "potential slip and fall," you know. I might say in there, but it's unlikely, whatever. My style in filling out these petitions is to overstate things. I just do. I overstate things to be on the safe side.

Q. What is the effect in the bankruptcy courts of failing to list potential third-party claims that the debtor may have?

A. Well, the worst case scenario it could amount to a criminal violation. I think -- it's not going to happen for your average slip-and-fall, but let's say you had a person with $100,000 claim and he knew he was getting paid next week. He has all kinds of documentation he's received from his lawyer. He knows absolutely if this is coming through. At that point it's rising to the point of criminal, that you're defrauding your creditors.

But for the most part a person is allowed to amend their petition for simple omissions or mistakes. And in between those two extremes I think there is a possibility that the petition could be dismissed and discharge not entered and potentially even the person being barred from coming back to the Bankruptcy Court with their claims.

Q. How hard is it to reopen a bankruptcy petition?

A. It's not hard, as a general rule.

Q. After this lawsuit was filed, did Elizabeth Reis ever come to you and say, "I've just filed a personal injury action in the Providence Superior Court against Amtrak. Should I amend my petition?"

A. No. She never contacted me about it.

Q. What was the last contact you had with Elizabeth Reis?

A. I do recall she was very slow in paying me. And I recall that the case stayed in my file for quite a few months after. Basically I let her pay slowly because she was trying to raise her sister. She periodically sent me in checks. I may have -- she may have called me on the phone or something like that and said that they're on the way in.

I'm also a state representative. I recall maybe that summer, something like that, campaigning on the street and quickly running into her.

Q. When you said "that summer," last summer?

A. No. It would have been the summer of 2005.

Q. When was the last time you had any substantive --

A. No. I would have been the following summer, I'm sorry, 2006.

Q. When was the last time you had any substantive contact with Elizabeth Reis regarding her bankruptcy petition?

A. I haven't at all.

Q. Since its been closed?

A. I haven't discussed it with her since at least 2005.

Q. Has any of her attorneys, either Mr. Farley or Mr. Costello, come to you about amending the bankruptcy petition and reopening the bankruptcy petition?

A. No. I wouldn't have thought it necessary to amend the petition. Had that question been posed to me, I would have said to write Andrew Richardson a letter. And if he felt that it was something that

he was interested in, he could open it himself.

Q. Did anybody ever come to you and say -- either Ms. Reis's attorney or Ms. Reis herself -- come to you and say, "I've just filed this case against Amtrak. What should I do?"

A. No.

Q. On the bankruptcy petition, can you identify where you would list a potential third-party claim.

A. Sure. On Schedule B, the very last type of property, Number 33, "Other personal property of any kind not originally listed." I would have listed -- I might have put it in the same paragraph or listed it separately from the worker's comp.

Q. Could it be listed in Paragraph 20, I'm sorry, in Category 20, "Other contingent unliquidated claims"?

A. I've never put it there.

Q. No?

A. The main thing is that it's listed.

Q. That it's listed?

A. Yes.

Q. Reading Paragraph 6 of your affidavit it struck me that Paragraph 6 related -- strike that.

Reading Paragraph 6 I was under the impression that you didn't really have a recollection of specific conversations that you had with Ms. Reis and specific answers that she gave, and this just reflects your general practice; is that correct?

A. Like I said, the only thing I specifically remember about the conversation with Ms. Reis is her pulling back a little bit and motioning towards her feet and saying that she didn't have any ability to sue anybody else for her injury, that type of thing. The other things that you asked, you know, I don't recall being said at all, and may not have been said. And yes, it also lists my practice with each and every case.

Q. Is the fact that the claim against Amtrak is not listed in the bankruptcy petition of Ms. Reis the sole basis for your statement in Paragraph 6 that, "If I felt there was any chance of this, I would have listed it as a potential property on Schedule B of her petition"?

A. Yes.

Q. How did you prepare for this deposition today?

A. I didn't prepare anything.

Q. Did you have any discussions with anyone?

A. I talked with Attorney Costello about it, yes.

Q. Can you tell me what you said and what Mr. Costello said during that conversation?

A. Nothing that I haven't said here, you know. I explained to Fred my routine that I go through with interviewing each and every client and putting the petitions together, just like I've explained here. I don't recall anything else specifically being talked about.

Q. How long was that conversation?

A. We've had -- we played phone tag a lot. Maybe talked a couple of times about this.

Q. Okay.

A. Five minutes each time.

Q. And how did you work getting the affidavit to him, getting it signed?

A. I remember offering to put one together when he first contacted me about this. I felt that I could offer this as being something that's really relevant to the issue, so I offered to put it together.

Q. Did you offer to prepare the affidavit or were you asked to prepare the affidavit?
A. I offered to. Then I typed it myself.
Q. Are you licensed only in Rhode Island?
A. Yes.
Q. And how long have you practiced law?
A. Since June 2, 1999.
Q. And I have seen your Web site. What areas do you practice in primarily?
A. I like to practice just bankruptcy and criminal, if I can, but my clients typically need other things. I go to Family Court for minor things and I'll do some wills, simple wills for people. It's pretty much a mix of things, but I try and keep it down to that. I have not practiced personal injury or worker's comp in many years. I disliked it, and I finished my last case a couple of years ago, I think, finished it up.
Q. What percentage of your practice would you say bankruptcy represents?
A. Now it's 90 percent.
Q. At the time in 2005, time of Elizabeth Reis's bankruptcy filing?
A. Probably, like, 40 percent.

Q. And at the time of her bankruptcy filing, what percentage of your practice would have been criminal?
A. Probably 30 percent.
Q. What types of criminal cases do you handle?
A. Mostly any misdemeanors or lower-grade felonies.
Q. You also indicated that you did some wills and probate work back in 2005. What percentage of your practice was that?
A. Very small, maybe one percent.
Q. And then personal injury lawsuits, what percentage of your practice did that make up in 2005?
A. A pretty good amount. I guess maybe five or ten percent.
Q. Were you always representing claimants in these actions?
A. Yes. I felt I was successful at it, but I was losing sleep over the cases and didn't feel that people were happy with them all the time. I decided it's not something I was interested in doing anymore.
Q. Just a rough estimate, since 1999, between

1999 and 2005, approximately how many personal injury cases would you have handled involving torts?

A. I guess about seven or eight.

MR. DWYER: Off the record.

(Recess taken)

BY MR. DWYER:

Q. Attorney Jacquard, I noticed that you did not raise, nor did Ms. Reis's counsel, raise the attorney-client privilege for any of the questions that I asked. Why is that?

A. Well, there is some case law, which I've read quite a bit of it, that states that there really isn't much of an attorney-client privilege in bankruptcy because the person, once they file a bankruptcy petition, they're responsible to divulge all of their financial information. I only have financial information in the file. I do have some cases, some interviews which I've done, where I've refused to file cases because I didn't think that -- the person either wasn't being truthful with me or any number of things. And if I had notes from an interview like that, then I would say that I can't divulge that information to you. But once these bankruptcy cases are filed, I haven't got a single

one with anything to hide. As I said, the case law is pretty clear, I think, in bankruptcy. There is really no privilege because they're responsible to divulge this information to the public anyway.

Q. Have you ever given a deposition before as an attorney? I understand you're a police officer.

A. I don't think so, no.

MR. DWYER: I'll pass the witness at this time to Mr. Costello.

I'd also indicate that this deposition should remain open until Attorney Jacquard can turn over his file relating to Ms. Reis. And at that time we'll make a determination as to whether we need to come back and ask questions regarding that file. As indicated, we have a hearing currently scheduled on summary judgment issue for May 12th. We ask for a continuance.

So I ask if you could get that to me by Friday, that would be great.

CROSS EXAMINATION

BY MR. COSTELLO:

Q. Good morning, Mr. Jacquard. I just want to ask you a couple of questions.

First, Mr. Dwyer already inquired as to

your primary concentration of your practice. It is bankruptcy; is that correct?

A. It is now.

Q. And back in 2005 it was almost about 40 percent of your practice?

A. Yes.

Q. And you did do some personal injury work at that time?

A. Yes.

Q. At the present time, although you don't do any personal injury work, you're in a firm or in a building where the firm is primarily a personal injury firm, Gemma Law Associates?

A. Yes.

Q. Now, you also indicated that Ms. Reis apparently was referred to you by her brother John Reis; is that correct?

A. Yes.

Q. Now, you indicated that he had a professional office roughly across the street from where your office formerly was?

A. Yes.

Q. On Park Avenue in Cranston?

A. Yes.

Q. Were you personal friends with John Reis or was that just a professional relationship?
A. I mean, we're on a very friendly basis, but I don't go out and socialize with him.
Q. It's something where he's a professional, he's across the street from you, you say hello and chat, but you don't go out to dinner together; your wives don't socialize or anything like that?
A. No.
Q. You obviously did, you charged Ms. Reis for your services. It wasn't a pro bono thing for a friend that you did?
A. No.
Q. And you indicated that you have a general practice of going through your schedules page by page with the individual at the time you're interviewing them; is that correct?
A. Yes.
Q. Do you ever give a blank petition to the individual and tell them to work at it at home, "Fill it in. If you can't fill it in, I'll help you when you come in the next day" or anything like that?
A. Never.

Q. No, okay. And in reference to your questioning of Ms. Reis, when you got to the point when you were discussing her injury and the worker's comp claim, you said that that's a particular area that you are very careful about. Is that a fair statement?

A. Yes.

Q. And when you were questioning Ms. Reis, do you have any memory of her being evasive or holding anything back from your interview?

MR. DWYER: Objection. Calls for speculation. You can answer.

A. Definitely not.

Q. Okay. And when you were asking questions, did you ever feel that she wasn't being completely candid with you in her responses?

A. No.

Q. And you were aware that she had an injury and she was making a claim for an injury to her worker's comp insurer; is that correct?

A. Yes.

Q. Mr. Farley was her attorney?

A. Yes.

Q. To your knowledge, did she ever indicate to

you that Mr. Farley had made a claim against Amtrak for that same injury?

A. Definitely not.

MR. COSTELLO: May I see the exhibit you showed him from the December 1st letter.

MR. DWYER: (Hands document to Attorney Costello)

Q. Now, I assume you've written on occasion, when you did practice in the personal injury field, claim notice of representation and claim letters to potential defendants?

A. Yes.

Q. I'm sure you've seen the typical claim letter that's sent out by Gemma Law Associates.

A. Yes.

Q. And looking at this letter of December 1, 2004, is this a typical claim representation letter that you were familiar with?

A. Yes. You know, it contains just the basic information, that the attorney represents the party.

Q. Is there anything in that letter that says, "We're making a claim against Amtrak"?

MR. DWYER: Objection. The document speaks for itself.

A. None that I see.

Q. All right. Generally, in your experience, when someone sends out a notification of a claim, does it usually say if you're insured for this type of liability or, "If you are not insured, would you please contact me" or anything of that nature?

MR. DWYER: Objection.

Q. Usually notice that language in letters of claims for representation?

MR. DWYER: Objection.

A. Yes.

Q. Is there anything in that particular letter that asks anything of that nature?

MR. DWYER: Objection.

A. No. It's just the opposite, really. If I saw that letter, I would think he was requesting information to put together his worker's comp claim.

Q. Okay. And were you aware at that point in time, in April of 2005, that there was an active attempt to remove Ms. Reis from worker's comp coverage?

A. I don't recall that.

Q. Do you know that, in fact, she was removed from worker's comp sometime in April of 2005?

A. No. I don't recall that.
Q. Okay. And do you recall anything that she said to you like, "If I lose my worker's comp, I'm going to file a claim against Amtrak"?
A. Definitely not.
Q. And you were satisfied after your discussion with her that everything that she told you led you to believe that her claim for her injury was a worker's compensation claim. Is that a fair statement?
A. Yes.
Q. And that's what you indicated in Paragraph 6 of your affidavit; is that correct?
MR. DWYER: Objection. Affidavit speaks for itself.
A. Yes.
Q. I think you indicated that, generally speaking, the courts allow petitioners to amend their bankruptcy petition should a claim arise at a future date?
A. Yes.
Q. And you saw in her affidavit, the last paragraph of her affidavit, she indicated that she certainly was willing to file an amended petition

for that bankruptcy situation; is that correct?

A. You want me to refer to her affidavit?

Q. Yes. Why don't you refer to her affidavit, Paragraph --

MR. DWYER: Objection.

A. 28, I think.

MR. DWYER: Objection. Document speaks for itself.

Q. 28.

A. Okay. I see that it is there.

Q. Now, you've indicated that in the past that if you felt a person wasn't being candid with you or you felt they were hiding something, you would refuse to file a petition for that person; is that correct?

A. That is correct.

Q. Did you have any suspicions or compulsions to refuse to file this petition on behalf of Ms. Reis?

A. No.

MR. COSTELLO: That's all I have.

MR. DWYER: That's all. Thank you very much.

(Whereupon, the deposition was suspended at 11:53 a.m.)

C E R T I F I C A T E

I, ROBERT B. JACQUARD, do hereby certify that I have read the foregoing transcript of my testimony, and further certify under the pains and penalties of perjury that said transcript (with/without) suggested corrections is a true and accurate record of said testimony.

Dated at ___________, this ____ day of _________, 2008.

______________________

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS. )

I, Grant D. Hackett, Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 6th day of May, 2008, at 10:43 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand and affixed my notarial seal this 8th day of May, 2008.

Grant D. Hackett

Notary Public

My commission expires 8/11/11