# EXHIBIT 13

Volume I
Pages 1 to 83
Exhibits 1 to 11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x

ELIZABETH A. REIS,
Plaintiff,

vs.

NATIONAL PASSENGER RAILROAD CORPORATION, A/K/A NATIONAL RAILROAD PASSENGER CORPORATION,
Defendant.

Civil Action No. 07-236S

- - - - - - - - - - - - - - - - - -x

DEPOSITION OF MICHAEL J. FARLEY, ESQ., a witness called on behalf of the Defendant, taken pursuant to the Federal Rules of Civil Procedure, before Linda A. Walsh, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on Monday, July 14, 2008, commencing at 11:01 a.m.

PRESENT:

Flaherty, Butterfield & Costello
(by Frederick A. Costello, Esq.)
33 College Hill Road, Suite 20D, Warwick, RI 02886, for the Plaintiff.

Edwards Angell Palmer & Dodge, LLP
(by Paul E. Dwyer, Esq.)
2800 Financial Plaza, Providence, RI 02903-2499, for the Defendant.

(Continued on next page)

PRESENT (Continued):

S. Paul Ryan, Esq.
670 Willett Avenue, East Providence, RI 02915, for Michael J. Farley, Esq.

* * * * *

Social Security.

Q. Roughly out of your practice what percentage does workers' comp. make?

A. Probably 30, 35.

Q. And how about personal injury?

A. Probably 30, 35.

Q. Would most of your personal injury cases arise through the workers' compensation cases that you're handling?

A. Not most, no. Some. I couldn't give you a percentage on that.

Q. Are you here in response to a subpoena that was served upon you sometime back in May of this year?

A. I am.

Q. I show you what has been marked as Exhibit 1. Is that the subpoena with the attached exhibits that was served upon you?

A. Yes.

Q. As a result of that exhibit did you provide my office with certain documents that were called for in the subpoena?

A. Yes.

Q. I just show you what's been marked as

Exhibit 2, Farley Exhibit 2, which is ten pages of what appear to be e-mails.

MR. COSTELLO: Is that the same packet that was sent out July 8th?

MR. DWYER: Yes. I just remarked the exhibits so we can use them in the deposition.

A. Yes, those appear to be copies of e-mails which I sent on July 8th.

Q. Are these e-mails part of your -- well, step back.

I understand from your response to the privilege log that you have two files relating to Elizabeth Reis; is that correct?

A. Right now I have three, actually. One involves this proceeding, but prior to that I had two files. One is a worker's comp. file and one is a miscellaneous liability file.

Q. What do you mean by "miscellaneous liability file"?

A. It's not an auto accident.

MR. COSTELLO: Sorry. I didn't hear you, Mike.

THE WITNESS: It's not an auto accident claim.

Q. How do you generally divide your personal injury files up in your office?

A. I would note them as being AA, which is an auto accident. Miscellaneous liability would include things like slip and falls, that type of thing. I think I may have a separate designation, MM, for medical malpractice, not that I do a lot of that.

Q. Why did you set up two files in this case?

A. Because that is my practice to do so.

Q. When did you first set up the worker's compensation file in this case?

A. It would have been within days of August 12th, 2004.

Q. When did you first set up the miscellaneous personal -- miscellaneous liability file?

A. I don't know for sure, but I would guess it would be set up at the same time.

Q. Your initial meeting with Elizabeth Reis was 8/12/04?

A. That's correct.

Q. Do you know how she was referred to you or how she came to you?

A. No, I don't. I was thinking of that this

MR. COSTELLO: Can I see Exhibit 3 for a second?

(Document handed to Mr. Costello)

Q. Is it the regular practice of your practice to create such records?

A. Yes.

Q. Is it your regular practice in your practice to maintain such records?

A. Yes.

Q. Where are these maintained?

A. They are maintained on my computer.

Q. Are copies downloaded to the file of the chronology?

MR. COSTELLO: Thank you.

(Document handed to Mr. Dwyer)

A. I'm not sure I understand.

Q. Sure. If you -- you've indicated that what's been marked as Farley 3 is kept on your computer. My question would be do you make a hard copy and place it in your file?

A. I did in this case because of the subpoena. Normally it is kept in digital form in an archived portion of my hard drive.

Q. What about the e-mails; where are these

kept?
A. They are also kept on the drive.
Q. Were these downloaded and placed into Elizabeth Reis' personal injury file?
A. The ones that you're referring to?
Q. Let me rephrase it. Farley 2, the ten pages of e-mails, were hard copies of those printed and placed in either her worker's compensation file or her personal injury file?
A. They were downloaded and copied in connection with your subpoena. Let me just clarify that. Normally a lot of what I do is done on the computer screen to minimize paper documents.
Q. Is it part of your regular practice to retain communications from clients such as Ms. Reis on your computer system?
A. Yes.
Q. Is it part of your regular practice to reply to those e-mails via computer system?
A. Most of the time.
Q. I noticed on the -- looking at Exhibit 2 I saw two different addresses for Elizabeth Reis. On the November 19th, 2004, e-mail there is an e-mail address of ertours@cox.net.

MR. COSTELLO: I'm sorry. I didn't hear. Which one were you referring to?

MR. DWYER: Actually, let me strike that.

MR. RYAN: There's one at Verizon and one at Cox.

MR. DWYER: Yes.

Q. Did you generally contact Ms. Reis via e-mail, when you did by e-mail, at ertours@verizon.net or was it ertours@cox.net?

A. My recollection is there was a change in her e-mail address sometime during the time that I was involved with her. So her primary address, as I understood it, was both at different times.

Q. As to Exhibit 4, can you tell me what those are?

A. Those are -- that is a copy of my original intake notes with respect to Ms. Reis.

Q. Are these true and accurate copies of your intake notes?

A. Yes.

Q. Is it your usual practice to make these intake notes? Is it your usual practice to make these intake notes?

A. Yes.

assistant, maybe to replace her." Then there's something there about no computer.

Q. Is there a No. 4?

A. No.

Q. At that -- how long did that intake meeting last?

A. This is probably one of the best ones I've ever done, quite frankly. It's funny. It probably took 45 minutes because of the complications with the underlying health issues.

Q. Do you recall what was discussed at that meeting?

A. Yes.

Q. Do you recall -- you discussed with her a potential worker's comp. claim, I take it?

A. Yes.

Q. Did you discuss with her a potential claim against Amtrak at that meeting?

A. Yes.

Q. What do you recall about your conversation with Ms. Reis about a potential claim that she may have against Amtrak as a result of the fall in June 2004?

MR. COSTELLO: For the record I'm going to

object. Obviously the court has ordered that he answer it, but for the record I'm objecting to it.

A. Let me give you a general answer first and then I'll talk about specifics. Generally when a comp. claimant has a potential third-party case, I go over the worker's comp. claim first, and I will then tell them, after I've gotten all the facts I need for the insurance case, that there may be two cases and that they may have a potential claim against the owner of the property where they fell or the other driver in an auto accident case or something of that nature.

And the difference between the two cases is that, with respect to the worker's compensation claim, you recover weekly worker's compensation benefits, payment for medical expenses, and some limited amounts for any permanency or scarring that you suffer as a result of the injury.

The tort claim pays damages which exceed that -- which include and exceed that in the sense that there are -- there is a potential for recovery of pain and suffering, more wage recovery and other damages, emotional distress and that type of thing.

Q. Did you tell this to Elizabeth Reis?

A. Yes. Maybe not in those words, but generally speaking, that's what we talked about.

Q. And you indicated that you had a particular recollection of the conversation?

A. Yes.

Q. What was the particular recollection?

A. I remember -- I can see her in my office. I remember having this discussion with her, and I know we talked about it.

Q. Talked about it? Talked about what?

A. About the third-party claim.

Q. Against Amtrak?

A. Yes.

Q. Did you come up with a plan or strategy regarding the third-party claim against Amtrak that you relayed to Ms. Reis?

A. Yes. She told me that she had given a statement.

Q. Was this at the initial meeting she told you about the statement?

A. Yes. She told me she had given a statement.

Q. What did you say to her about that?

A. I wanted to know who she gave it to, and I

strike that.

Did you discuss with her any issues of causation, about proving that her injuries were related to the fall?

A. You mean her fractured foot?

Q. Fractured foot and any fibromyalgia claim or anything else she was asserting.

A. I know that we discussed the causal relationship between fibromyalgia and that injury. Whether it was in the context of a third-party claim, I'm not sure. I know we discussed it many times in the context of her worker's comp. claim.

Q. And this discussion occurred on August 12th, 2004?

A. Yes, and -- yes, because the notes are so detailed, and I remember this Hashimoto's syndrome thing. There was a question -- she knew something about it. There was a question about it being a symptom of the fibromyalgia.

Q. Do you recall any other conversations that you had with Elizabeth Reis that are not documented in those notes?

A. I talked to her on the phone several times.

Q. Do you recall what those conversations were

about?

A. Primarily about her comp. claim.

Q. During those conversations did the third-party claim against Amtrak -- or potential third-party claim against Amtrak ever come up?

A. It came up at least once that I know of because it's in one of the notes that I gave you, and in fairness, it probably came up a couple of other times, a few other times.

Q. Do you recall in particular what was discussed during those conversations?

A. She would ask me, as she did in the e-mails, whether I had talked to Seth Starr who was a claim representative for Amtrak.

Q. Do you recall when she made that first inquiry?

A. I don't. I know there's one in one of the exhibits.

Q. We'll get to the e-mails. I'm showing you what's been marked as Defendant's Exhibit No. 5 -- I'm sorry -- Farley 5. It's two pages. Can you tell me what that document is?

A. Those are -- or that is a communication, a letter I received from Mr. Costello with an

attachment.

Q. This letter and the attachment authorizes the transfer of the worker's compensation file and the personal injury file to Mr. Costello, correct?

A. That's correct.

Q. Had you asserted a lien on either the personal injury case or the worker's compensation case?

A. No.

Q. Under Rhode Island law does the plaintiff's attorney who works on the file automatically have a lien by statute?

A. No.

Q. As a result of receiving this letter did you in fact transfer the file?

A. I did.

Q. Did you transfer those e-mails that you responded to in the subpoena with them?

A. I did not.

Q. Is there a reason why you did not?

A. Other than forgetting about them, no.

Q. Did you terminate the relationship with Ms. Reis or did Ms. Reis terminate the relationship with you?

A. She terminated with me.

Q. Did she say why she terminated the relationship?

A. No. I got Mr. Costello's communication. There were some e-mails where she expressed some unhappiness, and I assumed that was what the problem was.

Q. Are those e-mails included in the e-mails that you sent with the subpoena?

A. I believe so.

Q. Looking at Farley Exhibit 6 --

A. Yes.

Q. -- is this a document in which you prepared?

A. Yes.

MR. COSTELLO: Can I see what that is?

MR. DWYER: I'm sorry. It's the privilege log.

MR. COSTELLO: Okay. Thanks.

A. Yes, I did prepare it.

Q. You indicated I guess on Page 3 of the privilege log certain documents, a number of documents. Do you see that?

A. Yes.

be as honest and complete as possible.

Q. Did your review of that entire personal injury file assist you in your recollection in testifying today?

A. Yes. This is the personal injury file (indicating). There's two pages in it, one of which is the November 19th, 2004, e-mail from Ms. Reis, and that may have been what caused me to set up this file, and then the letter to Mr. Starr.

Q. I see. So the entire personal injury file is two pages?

A. Correct. The medical, all of that stuff, because the worker's comp. case was ongoing, was kept in the comp. file.

Q. If the case had proceeded to suit in Federal Court with you as her attorney, would the medical records have been transferred from the worker comp. file or copies put into the personal injury file?

MR. COSTELLO: Objection, speculative.

A. They would have been copied.

Q. What's your home address, sir?

A. 41 Kingsford Avenue, East Providence, Rhode Island 02915.

Q. The e-mails that you provided that are now identified as Exhibit 2, these are true and accurate copies of the e-mails that are on your computer system responsive to the subpoena?

A. Yes.

Q. How did you go about searching your computer for those?

A. The e-mails are kept separately from the file chronology. The file chronology is kept in Amica's files, and there is an archive file. They are basically Word documents. The e-mails are kept as whatever Outlook uses to store their files. In order to find these, I searched using "Reis," which is not a common name.

MR. COSTELLO: What was that word, please?

THE WITNESS: I used "Reis" to search.

Q. You indicated that you would provide the e-mail regarding a conversation with Mr. Starr, correct?

A. Yes. It's not an e-mail. It would be a chronological note, but yes, I certainly will.

Q. When's the last time you spoke with Ms. Reis?

A. June of '05 probably, June or July of '05.

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS. )

I, Linda A. Walsh, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 14th day of July, 2008, at 11:01 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand and affixed my notarial seal this 15th day of July, 2008.

Linda A. Walsh

Notary Public

My commission expires 3/5/2015