DEFENDANT'S EXHIBIT B



Volume I
Pages 1 to 95
Exhibits 1 to 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - - - - - -x

ELIZABETH A. REIS,
Plaintiff,

vs.

NATIONAL PASSENGER RAILROAD CORPORATION, A/K/A NATIONAL RAILROAD PASSENGER CORPORATION,
Defendant.

Civil Action No. 07-236S

- - - - - - - - - - - - - - - - - - - - -x

DEPOSITION OF ELIZABETH A. REIS, a witness called on behalf of the Defendant, taken pursuant to the Federal Rules of Civil Procedure 30, before Grant D. Hackett, Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Edwards, Angell, Palmer & Dodge, LLP, Providence, Rhode Island, on Monday, December 10, 2007, commencing at 10:10 a.m.

PRESENT:

Flaherty, Butterfield & Costello
(by Frederick A. Costello, Esq.)
33 College Hill Road, Suite 20D, Warwick, RI 02886, for the Plaintiff.

Edwards, Angell, Palmer & Dodge, LLP
(by Paul E. Dwyer, Esq.)
2800 Financial Plaza, Providence, RI 02903-2499, for the Defendant.

Also Present:
Seth Starr
Nancy Van der Veer

* * * * *

Q. You indicate in this matter that the police officer with whom you spoke indicated that he would put in a report on it?

A. Yes.

Q. When did you talk to the police officer?

A. He wasn't a police officer. He was the security, the person that dragged me off the train.

Q. Was he Amtrak security?

A. I think so.

Q. What did he look like?

A. He was short, kind of short, heavy-set. I think he was balding.

Q. Do you recall what his uniform looked like?

A. No.

Q. And how did you get Martha's name?

A. I don't know. I guess I just called information for the Amtrak number and --

Q. Okay.

A. -- she was the one that answered.

Q. And you understood you were calling the Amtrak claims department?

A. Yes.

Q. And this was your first step to telling your side of the story to make a claim, correct?

A. That is correct.
Q. And what, as best you can recall, can you tell me what Martha said to you and what you said to Martha?
A. I am so sorry. I have no idea.
Q. Do you recall how long a conversation it was with Martha?
A. I don't remember. The only part that I do remember of that conversation is her telling me she wasn't the one that I needed to talk to; that she would give my name to the claim, the person who would be talking to me.
Q. And was that Mr. Starr?
A. Yes.
Q. Do you recall if Mr. Starr contacted you or if you contacted Mr. Starr?
A. I don't remember.
Q. Was there anything -- how many conversations did you have with Martha?
A. I don't know for sure.
Q. How many conversations did you have with Mr. Starr?
A. I don't know that for sure.
Q. Do you know if it was more than one for

either?

A. I don't know for sure.

Q. Was there anything said between you and Mr. Starr during that conversation that is not recorded in this transcription?

A. I don't know.

Q. Do you recall if Mr. Starr ever asked you for medical bills?

A. I don't remember that. I don't remember that.

Q. Was there ever any discussion of the payment of money by Mr. Starr, by Amtrak on the part of Mr. Starr or the execution of a release by you regarding your claim?

A. No. The word "release," I don't believe, ever came into the conversation. I think I remember Mr. Starr saying something like "we pay" -- he said something, something and then "we pay -- we would then pay worker's comp back."

Q. Okay?

A. Something like that.

Q. So at this point there was nothing more to this conversation with Mr. Starr that you were beginning the process of making a legal claim

against Amtrak?
A. Correct.
Q. If you could turn to the first page of the statement.
A. (Witness complies)
Q. Do you recall what time -- and you can refer to the transcript if you want to refresh your recollection. Do you recall what time the train was set to arrive?
A. In Providence?
Q. Yes, in Providence.
A. Oh, I know exactly. 9:50.
Q. Was it on time that day?
A. I think so, yes.
Q. Before I forget to ask you, did the train leave the station after you were injured before the rescue arrived to get you?
A. I think that it did, but I'm not 100 percent positive.
Q. Do you recall roughly how many people were getting on the train?
A. No.
Q. Was it busy? Crowded?
A. I had only walked through, just gotten to

your claim against Amtrak, correct?

A. Correct.

Q. You indicated that the value there was unknown, correct?

A. Correct.

Q. Any reason why you didn't list the claim against Amtrak?

A. Because at that time it wasn't formally in litigation. At that time we didn't even know if we were going to go to litigation with Amtrak.

Q. Okay. Where did you get that understanding that your claim had to be currently in litigation in order to be listed as, listed on your bankruptcy petition?

MR. COSTELLO: I'm going to object and instruct you not to answer that because clearly it gets into attorney-client privilege.

Q. Would you agree with me nowhere in this bankruptcy petition is this claim against Amtrak identified?

A. No; that is correct.

Q. If you go back to the page prior, personal property, No. 20.

A. (Witness examines page)

A. Because he has done bankruptcy; he had a knowledge of bankruptcy court.

Q. Do you know how long Mr. Jacquard has practiced in bankruptcy?

A. No.

Q. What did your brother tell you about Mr. Jacquard's abilities?

A. He said he had high abilities.

Q. Have you ever made any effort to seek to reopen the bankruptcy to identify this claim to the bankruptcy trustee?

A. No.

MR. DWYER: Take a two-minute break.

(Recess taken)

BY MR. DWYER:

Q. Did Mr. Jacquard tell you not to list the claim against Amtrak or potential claim against Amtrak in your bankruptcy petition?

MR. COSTELLO: Objection. Move to instruct the witness not to answer on attorney-client.

Q. Did you tell Attorney Jacquard about your potential claim against Amtrak?

MR. COSTELLO: Again, I object and instruct the witness not to answer the question on the