DEFENDANT'S EXHIBIT F



Volume I
Pages 1 to 83
Exhibits 1 to 11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x

ELIZABETH A. REIS,
Plaintiff,

vs.

Civil Action No. 07-236S

NATIONAL PASSENGER RAILROAD CORPORATION, A/K/A NATIONAL RAILROAD PASSENGER CORPORATION,
Defendant.

- - - - - - - - - - - - - - - - - -x

DEPOSITION OF MICHAEL J. FARLEY, ESQ., a witness called on behalf of the Defendant, taken pursuant to the Federal Rules of Civil Procedure, before Linda A. Walsh, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on Monday, July 14, 2008, commencing at 11:01 a.m.

PRESENT:

Flaherty, Butterfield & Costello
(by Frederick A. Costello, Esq.)
33 College Hill Road, Suite 20D, Warwick, RI 02886, for the Plaintiff.

Edwards Angell Palmer & Dodge, LLP
(by Paul E. Dwyer, Esq.)
2800 Financial Plaza, Providence, RI 02903-2499, for the Defendant.

(Continued on next page)

PRESENT (Continued):

S. Paul Ryan, Esq.
670 Willett Avenue, East Providence, RI 02915, for Michael J. Farley, Esq.

* * * * *

assistant, maybe to replace her." Then there's something there about no computer.

Q. Is there a No. 4?

A. No.

Q. At that -- how long did that intake meeting last?

A. This is probably one of the best ones I've ever done, quite frankly. It's funny. It probably took 45 minutes because of the complications with the underlying health issues.

Q. Do you recall what was discussed at that meeting?

A. Yes.

Q. Do you recall -- you discussed with her a potential worker's comp. claim, I take it?

A. Yes.

Q. Did you discuss with her a potential claim against Amtrak at that meeting?

A. Yes.

Q. What do you recall about your conversation with Ms. Reis about a potential claim that she may have against Amtrak as a result of the fall in June 2004?

MR. COSTELLO: For the record I'm going to

object. Obviously the court has ordered that he answer it, but for the record I'm objecting to it.

A. Let me give you a general answer first and then I'll talk about specifics. Generally when a comp. claimant has a potential third-party case, I go over the worker's comp. claim first, and I will then tell them, after I've gotten all the facts I need for the insurance case, that there may be two cases and that they may have a potential claim against the owner of the property where they fell or the other driver in an auto accident case or something of that nature.

And the difference between the two cases is that, with respect to the worker's compensation claim, you recover weekly worker's compensation benefits, payment for medical expenses, and some limited amounts for any permanency or scarring that you suffer as a result of the injury.

The tort claim pays damages which exceed that -- which include and exceed that in the sense that there are -- there is a potential for recovery of pain and suffering, more wage recovery and other damages, emotional distress and that type of thing.

Q. Did you tell this to Elizabeth Reis?

A. Yes. Maybe not in those words, but generally speaking, that's what we talked about.
Q. And you indicated that you had a particular recollection of the conversation?
A. Yes.
Q. What was the particular recollection?
A. I remember -- I can see her in my office. I remember having this discussion with her, and I know we talked about it.
Q. Talked about it? Talked about what?
A. About the third-party claim.
Q. Against Amtrak?
A. Yes.
Q. Did you come up with a plan or strategy regarding the third-party claim against Amtrak that you relayed to Ms. Reis?
A. Yes. She told me that she had given a statement.
Q. Was this at the initial meeting she told you about the statement?
A. Yes. She told me she had given a statement.
Q. What did you say to her about that?
A. I wanted to know who she gave it to, and I

wanted to see if I could obtain it.

Q. Did you ever put a potential value on the claim against Amtrak?

A. On the third-party claim?

Q. Yes.

A. No.

Q. Did you ever tell, discuss with her liability issues that may arise from the claim?

A. Say that again.

Q. Did you ever discuss with her liability issues that may arise with the claim? For example, "You may recover if something happened."

A. Yes.

Q. What did you discuss with her?

A. Slip and fall cases are always difficult. I was -- I had some concerns about this particular claim because she was unable to identify what caused her to fall.

Q. Did you tell her those concerns?

A. Yes. "Concerns" may not be an accurate quote, but I told her that that was an issue. That I'm sure of.

Q. Did you discuss with her in general terms or in specific terms the relationship between --

strike that.

Did you discuss with her any issues of causation, about proving that her injuries were related to the fall?

A. You mean her fractured foot?

Q. Fractured foot and any fibromyalgia claim or anything else she was asserting.

A. I know that we discussed the causal relationship between fibromyalgia and that injury. Whether it was in the context of a third-party claim, I'm not sure. I know we discussed it many times in the context of her worker's comp. claim.

Q. And this discussion occurred on August 12th, 2004?

A. Yes, and -- yes, because the notes are so detailed, and I remember this Hashimoto's syndrome thing. There was a question -- she knew something about it. There was a question about it being a symptom of the fibromyalgia.

Q. Do you recall any other conversations that you had with Elizabeth Reis that are not documented in those notes?

A. I talked to her on the phone several times.

Q. Do you recall what those conversations were

to that, anything related to Amtrak.

Q. So I guess my question is have you reviewed both your personal injury file and your worker's compensation file to determine whether there are any documents in the worker's compensation file and the personal injury file that are responsive to the subpoena?

A. Yes.

Q. So I have all the documents in your possession which are responsive to the subpoena?

A. Yes. Let me add one thing to that. There may be one other telephone record that I have that I didn't see in the privilege log which I would be happy to supply. That is a conversation that I had with Mr. Starr at Amtrak. He may have a record of it. I have a brief note about it. And just so the record is clear, that conversation was inquiring about the statement, "He would not let me have it," and he indicated that they had some questions about liability because in the statement she said she didn't know what she fell over. My recollection is that was in February or March, and I can't explain to you why that's not there.

Q. You'll provide that later?

A. Yes. Sure.
Q. That conversation was in February or March of 2005?
A. I think so, yes.
Q. Showing you what's been marked as Farley 7. Can you tell me what that is? This is the December 2004 letter. It's not in the packet.
A. Yes. That is a letter that I sent to Seth Starr at Amtrak with respect to this matter.
Q. Did Ms. Reis authorize you to send this letter?
A. Implicitly.
Q. You understood that to be part of your job?
A. Yes.
Q. What was the purpose of sending this letter?
A. I wanted to get the letter -- the statement that she had sent -- could I take a look at it again?
Q. Sure.
A. That is what I call a letter of representation.
Q. Did you ever have a conversation with anyone at Amtrak regarding Ms. Reis before this