UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**ELIZABETH REIS**

**VS C.A. NO. 07-236S**

**NATIONAL PASSENGER RAILROAD CORPORATION, A/K/A NATIONAL RAILROAD PASSENGER CORPORATION**

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER OBJECTION TO DEFENDANT'S MOTION TO STRIKE PORTIONS OF THE AFFIDAVITS OF ELIZABETH REIS AND ROBERT B. JACQUARD, ESQ. AND PORTIONS OF PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS AND PLAINTIFF'S RESPONSE TO DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

Plaintiff has waited to respond to Defendant's initial Supplemental Memorandum in Support of its Motion for Summary Judgment due to the fact that ongoing depositions were being taken of Robert Jacquard, Esquire and later of Michael Farley, Esquire. Those matters have all now been completed and Plaintiff will first address the issue presented by Defendant in its first Reply Memorandum in Support of Summary Judgment filed on April 29, 2008. Next, Plaintiff will present her case in opposition to Defendant's Motion to Strike Portions of Plaintiff's Statements of Undisputed Facts, Plaintiff's Affidavit and Portions of the Affidavit of Robert Jacquard.

## I. INTENT TO MISLEAD IS ONE OF THE ELEMENTS REQUIRED TO INVOKE THE DOCTRINE OF JUDICIAL ESTOPPEL

On page 3 of its Reply Memorandum dated April 29, 2008, Court Document Number 27, Defendant alleges that the First Circuit Court of Appeals does not require a showing of intent to defraud the Court to validate a finding of judicial estoppel. Defendant cites the case of Patriot Cinemas, Inc. v General Cinema Corporation, 834

F.2d 208 212 (1st. Cir. 1987) to support this contention. Defendant's argument is fatally flawed by the language in the case he cites.[1] In Patriot Cinemas, Inc. v General Cinema Corp., the First Circuit Court defined the elements needed to establish judicial estoppel. Initially, the Court indicated that: "in broad outline, the doctrine precludes a party from asserting a position in one legal proceeding which is contrary to a position it has already asserted in another. The specific requirements, however, are "rather vague" and vary from state to state and from circuit to circuit." Citing Moore's Federal Practice, p. 405(8) (2d ed. 1984.) The Court in fact stated some circuits and jurisdictions have never recognized the doctrine, citing a Tenth Circuit case, United States v 49.01 Acres of Land, 802 F.2d 387, 390 (10th Cir. 1986), Patriot Cinemas, Inc. v General Cinema Corp., 834 F.2d 214. After qualifying the doctrine as being less than totally accepted throughout the land, it went on to say that: "judicial estoppel should be employed when a litigant is "playing fast and loose with the courts," and when intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice." Citing Allen v Zurich Insurance Co., 667 F.2d 1162 (4th Cir. 1982), Jett v Zink 474 F.2d 149 (5th Cir.), cert. denied. 414 U.S. 854, 94 S. Ct. 153, 38 L. Ed. 2d 104 (1973), Patriot Cinemas, Inc. v General Cinema Corp., 834 F.2d 214, 215.

Therefore, as previously indicated in Plaintiff's initial Memorandum, intentional self-contradiction for the means of obtaining unfair advantage is a necessary element to invoke the sanction of judicial estoppel.

---

[1] Plaintiff cited Patriot Cinemas in her original brief to support her contention that intent is an element required to sustain a claim of judicial estoppel. See Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, at page 22, Court docket number 19.

In Patriot Cinemas, the Plaintiff was found to have intentionally misled the Federal Court by indicating it was not going to proceed with a state antitrust count that had been removed to Federal Court even if Patriot had won on appeal. After a Motion to Stay was filed by Defendant General Cinemas and denied because of the representations of Patriot Cinemas, Patriot Cinemas then restated its intention to proceed with the state antitrust case directly contradicting its previous statement that it would not do so. This intentional conduct on the part of Patriot Cinemas caused the Court to invoke the doctrine of judicial estoppel. Id. 216.

The issue is far less clear in reference to Elizabeth Reis. As this Court is well aware, Ms. Reis filed her claim against National Passenger Railroad Corporation (Amtrak) in June of 2007, almost three years to the day after her fall on an Amtrak car on June 23, 2004. The gravamen of Defendant's Motion for Summary Judgment is that Ms. Reis neglected to identify a claim against Amtrak in her Chapter 7 bankruptcy schedules at the time she filed her bankruptcy petition in April of 2005. Plaintiff alleges she did not intentionally omit the claim or intend to mislead the Court. That at the time she filed her bankruptcy in April of 2005 the information that she had was that both her bankruptcy attorney, Robert Jacquard, and her workers' compensation attorney, Michael Farley, felt that her claim was so tenuous that her bankruptcy attorney did not advise her to list it in her bankruptcy petition and her workers' compensation attorney never advised her to pursue the claim. This advice, or lack thereof, that she received from her attorneys certainly brings into question whether or not she intentionally omitted the claim and if, in fact, in April of 2005 there was a realistic potential claim that should have been

documented in her bankruptcy petition. Plaintiff will address these issues further in her next argument.

**II. SHOULD PORTIONS OF PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS, PORTIONS OF HER AFFIDAVIT AND PORTIONS OF ATTORNEY ROBERT JACQUARD'S AFFIDAVIT BE STRICKEN?**

Defendant in its most recent pleading, Court document number 57, requests that this Court strike certain portions of the Affidavits of Elizabeth Reis and Robert Jacquard, Esquire and Plaintiff's Statement of Undisputed Facts; namely, the following:

Paragraph 20 of Plaintiff's Affidavit, Plaintiff's Exhibit 2:

That I filled out the forms at his instruction and listed the claim I had for workers' compensation resulting from my injury on June 23, 2004. I did not list the claim against Amtrak because at that point in time I did not believe I was making a claim against Amtrak and, in fact, I had not made any claim against Amtrak at that time and I had no intention of pursuing a claim at that point. After discussions with Mr. Jacquard it was my belief that there was no claim to be made.

Paragraph 27:

That at no time did I intentionally attempt to deceive the Court or hide this claim in order to defraud my creditors or anything of that nature.

Paragraph 28:

That I certainly am willing to reopen my bankruptcy petition and file an amended 521 statement listing this claim. It was never my intention to hide this claim. I just never gave any thought to making a claim or that I actually had a claim and that thought process was reinforced by my discussions with Mr. Jacquard.

In addition, Defendant requests that the following three Statements of Undisputed Facts be stricken:

Statement 23: That Plaintiff discussed with Mr. Jacquard the circumstance of her fall of June 23, 2004 and they came to the conclusion that this was the only claim to be made.

Statement 24: That in April of 2005, Plaintiff's main focus was on remaining on workers' compensation and obtaining some debt relief.

Plaintiff had no intention or desire to make a claim against Amtrak.

Statement 27: That at no time did Plaintiff ever hide the issue that she was injured on June 23, 2004 and she listed all the claims she thought she had when filing the petition for bankruptcy in April of 2005.

See Plaintiff's Statement of Undisputed Facts, Plaintiff's Exhibit 3.

Finally, Defendant moves to strike Attorney Jacquard's Affidavit where he states in paragraph 6 that he is certain that Ms. Reis knew of no third party claim that she may have had and nothing she said in response to my questions led me to believe otherwise. See Plaintiff's Exhibit 4.

Most recently, Defendant has produced what it believes to be a "smoking gun" in the form of several e-mails sent to Ms. Reis' former workers' compensation attorney, Michel Farley, whereby on several occasions she inquired as to whether she would be able to recover any funds from Amtrak as a result of her fall, if he had obtained any information concerning a statement given to Seth Starr, a claims representative of Amtrak, and the fact that she hoped at some point to recover some of her losses from Amtrak. See Plaintiff's Exhibits 1a, 1b, 1c, 1d, 1e, 1f, 1g, lh, li and 1j.[2]

Defendant logically points out that the e-mails clearly appear to contradict Ms. Reis' responses in filling out her bankruptcy petition where she indicated her only pending claim was a workers' compensation claim due to the fall on the Amtrak train. In addition, the e-mails clearly indicate that she desired to pursue Amtrak for some recovery during the period of time when she was in her bankruptcy proceeding even though her

[2] It should be noted Attorney Farley did not turn over the e-mails to Attorney Costello when the file was transferred in November, 2005. Attorney Costello did not have possession or knowledge of the e-mails when he prepared and submitted Plaintiff's Affidavit. See Farley deposition, page 25.

Affidavit in paragraphs 20 and 28, as well as in her Statement of Undisputed Facts, Statement number 24, would indicate the opposite.

To support his argument, Defendant cites the various e-mails sent by Ms. Reis to Mr. Farley beginning November 19, 2004 through September 10, 2005 where she states the following: in the November 19th e-mail she wrote she hoped she could get a" substantial recovery" from Amtrak . The e-mails in May and June are mainly concerned with getting information from the claims adjuster for Amtrak, Seth Starr. The July and September e-mails appear to inquire as to whether a settlement is possible. <u>See</u> Plaintiff's Exhibits 1a. through 1j. The e-mails are dated November 19, 2004, April 13, May 4, 9, 13, 16, June 1, 7, July 25 and September 10, 2005. The e-mails standing alone would appear to be very strong evidence that Ms. Reis intended to pursue a claim and hoped to receive money from Amtrak.

In Defendant's Memorandum he outlines the travel of the case with Attorney Farley through Mr. Farley's deposition. It is here that the so-called "smoking gun" evidence becomes less persuasive.

As we are talking about Motions for Summary Judgment, we view all inferences taken from evidence in a light most favorable to the non-moving party. <u>Lipset v University of Puerto Rico</u>, 864 F.2d 881, 895.

Plaintiff will address each e-mail and Attorney Farley's responses to show that while it might have been a hope of Ms. Reis to recover monies from Amtrak, that hope was never reinforced or substantiated by Attorney Farley. In fact, Attorney Farley attended to this "claim" with Amtrak as if it had little or no value and was not worth pursuing.

Plaintiff will take her history with Attorney Farley from the initial contact on August 12, 2004.

According to his deposition, Mr. Farley's intake notes indicate that on August 12, 2004 he went over primarily the workers' compensation claim and Ms. Reis' medical issues resulting from her fall on June 23, 2004. See Farley's deposition, pages 13-19.

In response to Attorney Dwyer's inquiry about discussions of a potential claim against Amtrak, Attorney Farley indicated that on August 12, 2004 he did mention there was a "possibility" of a claim against Amtrak; that Ms. Reis had previously given a statement, without counsel, to an Amtrak representative and that he wanted to obtain a copy of that statement. Mr. Farley never placed a value on the claim. He told her that slip and fall cases are always difficult and that he had concerns because she was unable to identify what caused her to fall. See Farley's deposition, pages 19-21. That was the end of any discussion concerning any "claim" against Amtrak until Ms. Reis sent an e-mail on November 19, 2004 to Mr. Farley. See Plaintiff's Exhibit 1a. Prior to that, Mr. Farley had taken no steps to investigate or pursue any claim that Elizabeth Reis had against Amtrak.

As a result of the November 19, 2004 e-mail, Plaintiff's Exhibit 1a, Attorney Farley sent a letter to Seth Starr of Amtrak on December 1, 2004, Plaintiff's Exhibit 5, requesting a copy of the statement Ms. Reis gave to him sometime in July of 2004. See Farley's deposition, page 36.

Mr. Farley told Ms. Reis that the basis for a potential cause of action would require her to identify the agent that caused her to fall and he needed to see the statement from Amtrak before he could determine what, if any, cause of action existed. See

Farley's deposition, page 35, line 19. In his deposition, Mr. Farley revealed that he had two files, the worker's compensation file, which from my observation was about two inches thick, and the personal injury file. According to Mr. Farley, that file contained two pages, the e-mail of Ms. Reis dated November 19, 2004, Plaintiff's Exhibit 1a, and his letter to Seth Starr, claims representative for Amtrak, dated December 1, 2004. See Plaintiff's Exhibit 5. See Farley's deposition, page 52.

Clearly, at this point in time, November 2004, Ms. Reis had expressed strong interest in recovering monies from Amtrak but her lawyer had told her that he did not know if she had a claim and had taken virtually no steps to investigate the claim nor did he take any actions towards prosecuting the claim.

In the e-mail dated April 13, 2005, Plaintiff's Exhibit 1b, Ms. Reis tells Mr. Farley that she filed for bankruptcy, that she was having trouble with her fibromyalgia, that she had been doing aqua therapy and had reinstated her land therapy. She also inquired as to whether she could work something out with the Providence Warwick Convention and Visitors Bureau and the worker's compensation carrier to carry her over until she secured new employment. This e-mail mentions nothing about a claim against Amtrak. Defendant, however, argues that because she is asking Mr. Farley to recover medical expenses and financial compensation for pain and suffering, this must refer to the Amtrak case. This leap of faith is without any basis and it assumes legal acumen of Ms. Reis that is completely without justification.

The next e-mail is dated May 4, 2005, Plaintiff's Exhibit 1c. At this point in time Ms. Reis is attempting to schedule an appointment with Mr. Farley. She also inquires whether anyone was able to reach Amtrak. In his deposition Mr. Farley indicated he

never responded in writing to any of the e-mails sent by Ms. Reis. See Farley's deposition, page 76.

The next e-mail is dated May 9, 2005, Plaintiff's Exhibit 1d. In this e-mail Ms. Reis talks about being fitted for orthotics and whether or not Mr. Farley spoke with the gentleman from Amtrak. No response was received from Mr. Farley.

The May 13, 2005 e-mail, Plaintiff's Exhibit 1e, is a discussion about her initial hearing in the Workers' Compensation Court since at the end of April 2005 she had been removed from workers' compensation coverage. She again asks if he had ever contacted anyone from Amtrak. No response was received from Mr. Farley.

In the May 16, 2006 e-mail, Plaintiff's Exhibit 1f, Ms. Reis thanks Mr. Farley for being pro-active in her behalf in her workers' compensation case and again asks if he had been able to contact the man from Amtrak.

In Mr. Farley's e-mail response on May 16, 2006, Plaintiff's Exhibit 1f, he told Ms. Reis that he was trying to keep her workers' compensation appeal alive in case there were any unexpected changes. He mentions nothing about Amtrak.

On June 1, 2005 Ms. Reis sent Mr. Farley a fairly long e-mail, Plaintiff's Exhibit 1g, mainly discussing problems with her left shoulder, elbow and arm and her physical therapy as well as the fact that she has virtually no money to pay for the physical therapy and this was the major reason she had to file for bankruptcy. She has no ability to pay for anything and how much longer can she do this. Again, she asks the familiar –" have you spoken with Seth Starr from Amtrak?" There was no response from Mr. Farley.

In her June 7th e-mail, Plaintiff's Exhibit 1h, Ms. Reis again asks about Seth Starr from Amtrak and indicates she is desperately in need of financial help. At this time she is

no longer receiving workers' compensation benefits. Mr. Farley responds with an e-mail one minute later and says we need to link you upper extremity difficulties with your foot injury as opposed to the fibromyalgia. He mentions nothing about Amtrak in his e-mail response. Plaintiff's Exhibit 1h.

In her July 25, 2005 e-mail, Plaintiff's Exhibit 1i, apparently there had been some communication with Mr. Farley on or about June 13th where he indicated he would check into the plans and claim policies of Amtrak for her. As of July 25th he had not gotten back to her and she had no idea as to where she stood. She had several questions about Lifespan sending her bills, whether workers' compensation will pay for her orthopedic therapy and her physical therapy. She also asks what happened in the Workers' Compensation Court appearance on June 23rd and what is happening with Amtrak? Should she expect any financial settlement? Ms. Reis received no response from Mr. Farley.

In her September 10, 2005, Plaintiff's Exhibit 1j, Ms. Reis states she received notice that her Blue Cross coverage was terminated, that she cannot pay for her doctor's visits and that she had $3.00 in her savings account and $30.00 in her checking account and no other financial resources. She can barely pay her monthly expenses for her house and utilities. She inquired as to when and if she is going to receive a financial settlement from the Providence Warwick Convention and Visitors Bureau, workers' compensation and/or Amtrak and a possible severance from her former employer. She received no response from Mr. Farley.

In his deposition, Mr. Farley indicates that he did speak with Seth Starr once in February or March 2005. See Farley deposition page 22. He also indicates that in

response to her question in her September of 2005 e-mail, Plaintiff's Exhibit 1k, as to whether she should expect any financial settlement from Amtrak, he indicates he never responded. See Farley deposition page 46.

Mr. Farley testified he told Ms. Reis on or about June 13, 2005 that he never obtained her statement from Seth Starr and that in order to get it he would have to file suit and that a Federal Court suit would be very expensive, that he would try to obtain the statement without doing that and she accepted that comment. See Farley's deposition page 49.

Mr. Farley also indicated that he never forwarded any medical records to Seth Starr despite correspondence from Mr. Starr requesting them. See Farley's deposition, pages 58 - 59.

When asked by Beacon Mutual Insurance Company, Ms. Reis' workers' compensation carrier, whether he was going to pursue the claim against Amtrak, Mr. Farley indicated he never responded. See Farley deposition, pages 60 -61.

When Mr. Farley was informed that Elizabeth Reis had filed bankruptcy, he never moved to be appointed her counsel in the Bankruptcy Court to pursue a claim against Amtrak. See Farley's deposition, page 71.

When asked whether he had informed Ms. Reis that she had to make sure to report this potential claim in her bankruptcy petition, he indicated he did not discuss that aspect of the case. See Farley's deposition, pages 71-72.

Mr. Farley indicated that he never spoke with her bankruptcy attorney, Robert Jacquard, that he never retained any expert witnesses nor did he make any investigation

in reference to the liability issue in reference to Amtrak. See Farley deposition pages 54, 69.

In response to the question asked of him point blank by Mr. Dwyer:

Mr. Dwyer: You made it clear to Ms. Reis, did you not, during the course of your representation of her that she had a potential claim against Amtrak?

Mr. Farley: I told her there was a possibility of a claim. See Farley's deposition page 53.

In response to a question from Attorney Costello:

Mr. Costello: Did you tell her that because she could not identify how she fell that she had a very weak claim in your opinion?

Mr. Farley: I would have told her that that caused me concern and it did and I am sure it did and that is why I moved to get the statement.

See Farley deposition page 73.

On page 78 of Mr. Farley's deposition he was asked:

Question: So, by September of 2005 you still had not decided whether you were going to pursue this claim?

Answer: That's is correct. If pursuing the claim means doing more than I had done, that is correct.

Question: Clearly, one of the major reasons was you felt it was a very, very tenuous, weak claim?

Mr. Dwyer: Objection.

Answer: I thought there was a problem with liability.

Question: So that is why 99% of your effort in this case was in the workers' compensation area?

Answer: That and the fact that there was ongoing litigation for a good portion of the time that I represented her and I guess it looked like her medicals were not getting paid at some point so that is where the effort went.

Question: The ongoing litigation was workers' compensation?

Answer: Correct.

Question: So when she filed her bankruptcy petition, she had no particular positive input from you as to whether or not she had a solid claim against Amtrak did she?

Answer: No, I wouldn't have told her that, I did not tell her that.

Question: So, getting back to an earlier question I asked you, there are many cases where there may be a very slight potential claim that you don't pursue correct?

Answer: Yes, there have been certainly.

Question: And this certainly could have been one of them?

Answer: Sure.

See Farley's deposition pages 78-80.

In reference to Defendant's Motion to Strike Portion of Attorney Jacquard's Affidavit, Defendant indicates that the Affidavit should be stricken because it is based on what Ms. Reis told him. In reference to Mr. Jacquard, he states that "I am certain Ms. Reis knew of no third party claim that she may have had and that nothing she said in response to my questions led me to believe otherwise." See Affidavit of Robert Jacquard, paragraph 6, Plaintiff's Exhibit 4.

I think at this point it is important to understand that the term "claim" is an esoteric term in reference to a layperson versus an attorney. At the time Ms. Reis was giving information to Mr. Jacquard and he was filling out her petition, she had presented him with the facts and circumstances of her fall. That is evident in the notes taken by Mr. Jacquard in his initial interview with Ms. Reis. The notes are submitted as part of Plaintiff's evidence, Plaintiff's Exhibit 6. As you can see in the notes, Ms. Reis identifies her slip and fall on the train owned by Amtrak and presumably, although it is not in the notes, she told Mr. Jacquard the same story she told Mr. Farley at his initial

interview, that she could not identify how she fell and up to this point in time there were absolutely no witness who had indicated how she fell. It was perfectly logical for Mr. Jacquard to agree that that set of circumstances didn't add up to a realistic potential claim. As he indicated in his deposition at pages 16, 17 and 18, third party claims are an important aspect of his interview process and that in every case he is very specific about inquiring around the circumstances of worker's compensation claims to see if there may be a potential third party claim. Mr. Jacquard testified that he created this Affidavit on his own based on his notes and memory, not on what Ms. Reis told him later or what Attorney Costello suggested to him. See Jacquard deposition page 27. That he felt very strongly about how he conducts his interviews and he felt he could put together an Affidavit that was absolutely truthful as it relates to the case. He also indicated, on pages 23 and 24 of his deposition, that he does not rely upon a lay person, such as Elizabeth Reis, to state she does not have a third party personal injury claim. He makes the judgment for himself based on the facts that he receives from the client.

For these reasons, Plaintiff does not believe anything in Mr. Jacquard's Affidavit should be stricken; especially, paragraph 6.

Plaintiff would concede that paragraph 28 of her Affidavit, Plaintiff's Exhibit 2, contains an incorrect statement. Clearly, Ms. Reis had given thought to making a claim and perhaps desired to make a claim against Amtrak. But as the Court can surmise from reading the deposition of Mr. Farley, and the Affidavit of Mr. Jacquard concerning the advice Ms. Reis received about the possibility of making a claim against Amtrak, that all of the professional acumen concerning the validity of a "potential claim" was negative. Mr. Jacquard was told the facts and circumstances of how she fell. It is in his notes that

he presented. He had no reason not to list the claim. It is his business and obligation to properly advise his clients. He takes pride in his ability to accurately advise his clients and he stated under oath that, in fact, he found no evidence of a valid third party claim based on the evidence he had in front of him. In reference to Mr. Farley, the documentation and his testimony points in only one direction. He had a two page file. He either outright told Ms. Reis that her claim was virtually worthless or his actions in not investigating the claim, not forwarding medicals, not pursuing discussions with Amtrak, not responding to inquiries, including the inquiries in Ms. Reis' e-mails, all add up to the inescapable conclusion that he felt the case had little or no value and he did not want to pursue it. Juxtapose the desperate cries for help of Elizabeth Reis for any type of financial assistance during a period when she had little or no money coming into her household, it is rather easy to see why she would reach out and grasp at any possibility that might free her from her financial and physical dilemmas.

In reference to paragraphs 23, 24 and 27 of the Statement of Undisputed Facts, Plaintiff's Exhibit 3, Plaintiff would state that number 23 is accurate to the extent of the advice given to her by Mr. Jacquard.

In reference to paragraph 24, Plaintiff would concede that she did have a desire to make a claim against Amtrak but that her main focus was on remaining on workers' compensation and that desire and intention were clearly not supported by the advice of the professionals who were representing her at the time.

The same is true in reference to paragraph 27. She did not hide the fact she was injured on June 23, 2004. She listed all the claims she was told she legitimately had when she filed for bankruptcy in April of 2005. She clearly hoped that she had

something more than a workers' compensation claim but whether that hope was realistically based at that time is certainly debatable. People believe when they fall on someone else's property that they deserve money. The Court knows this is not the case. Ms. Reis' attorneys at that time knew that was not the case. Arguably, Ms. Reis may have not known that that was the state of the law at the time she filed for bankruptcy in April of 2005. Perhaps she should have indicated in her Statement of Undisputed Facts that she listed all the "valid" claims she thought she had when she filed her bankruptcy petition in April of 2005. At some point this Court has to give some weight to the professional advise Plaintiff received and perhaps contrast that with her unrealistic hopes in the spring and summer of 2005. She listed what her attorney told her to list even though she may have wished for something else. This does not add up to an intentional attempt to mislead the Court.

At the time Ms. Reis filed her bankruptcy petition, she had no reports from Amtrak as to other witnesses to her falling over a bag; she had no testimony from the conductor, who admitted no one was supervising people going in and out of the train. Her lawyer hadn't investigated any possible liability issues. She was essentially a neophyte following the instructions of a bankruptcy lawyer who felt that with the evidence he had that there was no claim. She was desperately trying to get back on workers' compensation with her other lawyer who was concentrating all of his efforts in that particular area.

Thus, Plaintiff's argument is that despite these e-mails there is still no intentional act on her part to hide a potential claim against Amtrak when all of the professional

people around her were essentially saying or implying that there was no realistic potential claim against Amtrak regardless what she might have wished.

For these reasons and in looking at the state of the facts in a light most favorable to her, Plaintiff believes Defendant's Motion for Summary Judgment should be denied and that the Motion to Strike should be denied.

Plaintiff,
By her attorney,

/s/ Frederick A. Costello
Frederick A. Costello #2205
FLAHERTY, BUTTERFIELD & COSTELLO
33 College Hill Road Suite 20D
Warwick, RI 02886
Tel. 401-822-1800 x 6, Fax. 401-822-1879

**CERTIFICATION**

I hereby certify that on the _______ day of __________, 2008 I sent a true copy via electronically to: Paul Dwyer, Esquire and Andrew Richardson, Esquire.

/s/ Frederick A. Costello