**EXHIBIT A**

[redacted]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**ELIZABETH REIS**

**VS CIVIL ACTION NO. 07-236S**

**NATIONAL PASSENGER RAILROAD CORPORATION, A/K/A NATIONAL RAILROAD PASSENGER CORPORATION**

RECEIVED
APR 23 2008
Property of U.S. District Court
District of Rhode Island

**AFFIDAVIT OF ELIZABETH REIS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now comes Elizabeth Reis under oath and states the following:

1. My name is Elizabeth A. Reis. I am the Plaintiff in the above captioned matter. I was born on October 27, 1959. I live at 19 Ausdale Road, Cranston, Rhode Island. I am a single mother with one child, David, age 15.

2. That on June 23, 2004 I boarded the Amtrak Acela train that had stopped in Providence and was continuing from Boston to New York for a business trade show for my employer, the Providence Warwick Convention and Visitors Bureau.

3. That I entered the train after it stopped and was traveling through the quiet car. As I was about to enter the vestibule I tripped on a bag that according to the documents received from Amtrak belonged to a Nancy Brensson. I fell through the doorway into the vestibule.

4. That as a result of my fall, I suffered a comminuted fracture of my right foot, injuries to my neck, shoulder, knees and exacerbated a pre-existing fibromyalgia problem.

5. That after I fell I was told that I had to get off the train immediately as they had a schedule to keep. I believe the individual who ordered me to get off the train was Brian Radovich, the conductor employed by Amtrak. His quote to me was: "Lady, you going to stay on or get off, we got to get this train moving."

6. That at that time I was lying on the floor in incredible pain and could not lift myself off the floor.

7. That the next thing that happened was my luggage was taken off the train, thrown on the train platform and two security guards took me by the wrists and pulled me off the train. Eventually, I had to lean on one of the security guards for about ten minutes prior to an emergency vehicle coming to take me to the Hospital.

8. That prior to being taken off the train, I informed the conductor that I was unable to get up on my own.

9. That I was transported to the Hospital, admitted, and diagnosed as previously stated. Later that day I spoke about the incident to my father and he asked if I had filed any type of report as to my injury. I said I had not. I didn't remember signing anything. He indicated to me that I should obtain a copy of the report as to what happened.

10. That I also indicated how angry I was as to how I had been treated after I had fallen and he told me I should voice my complaint to management.

11. That as a result the next day I did call Amtrak in Boston and spoke with a woman by the name of Martha O'Neil. She indicated to me that if I had a complaint, she would put me in touch with someone from Amtrak or they would contact me.

12. That several days later an individual by the name of Seth Starr contacted me and asked if I would give him a recorded statement. I said yes and did, in fact, give him a recorded statement, voicing my displeasure with how I was treated after I had fallen on the train. At that time, I made no claim for monetary damages from Amtrak and, in fact, told Mr. Starr that I intended to proceed through my employer's workers' compensation carrier, Beacon Mutual Insurance Company.

13. That Mr. Starr eventually finished the conversation with me and that was the last time I spoke with anyone from Amtrak.

14. That subsequent to that time I received workers' compensation benefits and it is my understanding and belief that my workers' compensation attorney at the time, Michael Farley, contacted Amtrak on or about December 4, 2004 and requested a copy of the taped statement that Mr. Starr had taken from me on July 2, 2004.

15. That to my knowledge, Mr. Farley never made a claim for any monetary sum from Amtrak nor did he indicate that a claim was being made against Amtrak. It is my understanding that he requested a copy of the statement and a copy of any reports concerning what actually happened on that day.

16. To my knowledge and belief, that was the only time Mr. Farley had any contact with Amtrak and was the last contact that any attorney or I had with Amtrak prior to filing suit in June of 2007.

17. That prior to being injured, I was earning approximately $49,000.00 per year in my job with Providence Warwick Visitors Convention Bureau. Because my workers' compensation benefits paid me a little over $2,300.00 per month, I was basically having to survive on half of my annual salary.

Case 1:07-cv-00236-S-DLM Document 22 Filed 04/23/2008 Page 3 of 4

18. That because of this, I became further and further in debt and was unable to meet my monthly obligations. I was in great fear that my home would be taken and my son and I would be without a place to live.

19. That with that in mind, I hired Robert Jacquard, Esquire to file a Chapter 7 bankruptcy petition to alleviate my debt burden while I was injured.

20. That I filled out the forms at his instruction and listed the claim I had for workers compensation resulting from my injury on June 23, 2004. I did not list a claim against Amtrak because at that point in time I did not believe I was making a claim against Amtrak and, in fact, had not made any claim against Amtrak at that time and I had no intention of pursuing a claim at that point, after discussions with Mr. Jacquard it was my belief that there was no claim to be made.

21. That in April of 2005 my absolute main focus was staying on workers' compensation as my employer was attempting to file motions to remove me from workers' compensation, which were later successful temporarily.

22. That later that month I was, in fact, removed from workers' compensation and in November of 2005 I hired new counsel, Attorney Frederick Costello, to attempt to get me back on workers' compensation because of the ongoing problems with my foot, shoulder and especially my fibromyalgia symptoms. In February of 2006 I was placed back on workers' compensation and that decision was appealed by my employer's insurance carrier, Beacon Mutual. It was litigated extensively from February of 2006 through May of 2007. Mr. Costello, to my knowledge, never contacted Amtrak to make any claim or had any communication at all with Amtrak.

23. That in May of 2007 I was able to obtain a settlement with my workers' compensation carrier and had a pending claim for Social Security benefits with the United States government.

24. That at this time Mr. Costello suggested that I may have a claim against Amtrak. However, he also indicated to me that the statute of limitations was about to run as of June 23, 2007 and we needed to move quickly to avoid facing that bar.

25. That Mr. Costello filed suit in the Providence County Superior Court alleging that I had been injured as a result of the negligence of Amtrak and that my injuries had been aggravated as a result of the negligence of Amtrak.

26. That this was the first and only time a claim was made against Amtrak for any injuries that I suffered on June 23, 2004.

27. That at no time did I intentionally attempt to deceive the Court or hide this claim in order to defraud my creditors or anything of that nature.

Case 1:07-cv-00236-S-DLM Document 22 Filed 04/23/2008 Page 4 of 4

28. That I certainly am willing to re-open my bankruptcy petition and file an amended 521 statement listing this claim. It was never my intention to hide this claim. I just never gave any thought to making a claim or that I actually had a claim and that thought process was reinforced by my discussions with Mr. Jacquard.

Elizabeth Reis

Elizabeth Reis

Subscribed and sworn to before me this 22 day of April, 2008.

Notary Public
My Commission expires: Aug 22, 2009