**EXHIBIT H**

Volume I
Pages 1 to 83
Exhibits 1 to 11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELIZABETH A. REIS, Plaintiff, vs. NATIONAL PASSENGER RAILROAD CORPORATION, A/K/A NATIONAL RAILROAD PASSENGER CORPORATION, Defendant. | Civil Action No. 07-236S |

DEPOSITION OF MICHAEL J. FARLEY, ESQ., a witness called on behalf of the Defendant, taken pursuant to the Federal Rules of Civil Procedure, before Linda A. Walsh, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on Monday, July 14, 2008, commencing at 11:01 a.m.

PRESENT:

Flaherty, Butterfield & Costello
(by Frederick A. Costello, Esq.)
33 College Hill Road, Suite 20D, Warwick, RI 02886, for the Plaintiff.

Edwards Angell Palmer & Dodge, LLP
(by Paul E. Dwyer, Esq.)
2800 Financial Plaza, Providence, RI 02903-2499, for the Defendant.

(Continued on next page)

Social Security.

Q. Roughly out of your practice what percentage does workers' comp. make?

A. Probably 30, 35.

Q. And how about personal injury?

A. Probably 30, 35.

Q. Would most of your personal injury cases arise through the workers' compensation cases that you're handling?

A. Not most, no. Some. I couldn't give you a percentage on that.

Q. Are you here in response to a subpoena that was served upon you sometime back in May of this year?

A. I am.

Q. I show you what has been marked as Exhibit 1. Is that the subpoena with the attached exhibits that was served upon you?

A. Yes.

Q. As a result of that exhibit did you provide my office with certain documents that were called for in the subpoena?

A. Yes.

Q. I just show you what's been marked as

Exhibit 2, Farley Exhibit 2, which is ten pages of what appear to be e-mails.

MR. COSTELLO: Is that the same packet that was sent out July 8th?

MR. DWYER: Yes. I just remarked the exhibits so we can use them in the deposition.

A. Yes, those appear to be copies of e-mails which I sent on July 8th.

Q. Are these e-mails part of your -- well, step back.

I understand from your response to the privilege log that you have two files relating to Elizabeth Reis; is that correct?

A. Right now I have three, actually. One involves this proceeding, but prior to that I had two files. One is a worker's comp. file and one is a miscellaneous liability file.

Q. What do you mean by "miscellaneous liability file"?

A. It's not an auto accident.

MR. COSTELLO: Sorry. I didn't hear you, Mike.

THE WITNESS: It's not an auto accident claim.

Q. How do you generally divide your personal injury files up in your office?

A. I would note them as being AA, which is an auto accident. Miscellaneous liability would include things like slip and falls, that type of thing. I think I may have a separate designation, MM, for medical malpractice, not that I do a lot of that.

Q. Why did you set up two files in this case?

A. Because that is my practice to do so.

Q. When did you first set up the worker's compensation file in this case?

A. It would have been within days of August 12th, 2004.

Q. When did you first set up the miscellaneous personal -- miscellaneous liability file?

A. I don't know for sure, but I would guess it would be set up at the same time.

Q. Your initial meeting with Elizabeth Reis was 8/12/04?

A. That's correct.

Q. Do you know how she was referred to you or how she came to you?

A. No, I don't. I was thinking of that this

A. I'm sorry. 19 Ausdale Road. The date of the interview is August 12th, 2004. Ms. Reis' date of birth is recorded as 10/27/59. Her Social Security number is 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. On the left are her various phone numbers. She was single and had one child at the time of the interview.

The next section, it says, "Versus," and that is "Providence/Warwick Convention and Visitors Bureau, One West Exchange Street, Providence, Rhode Island 02903." That was her employer at the time. Their telephone number is 274-1636. Date of injury is 6/23/2004.

Skipping down to the next section is "Beacon Mutual" who was the worker's comp. insurance company. Marie Pate was the worker's comp. adjuster. Their phone number is 825-2889. To the right of that is where I usually put the injuries. Here it's "Right foot." Date of incapacity, which is the first day that she did not work because of the injury, was June 24th, 2004. And it then says, "OOW since." That means out of work since. Her job was director of travel, industry sales. That next word is "administrative" which would be a description of her basic physical duties in the job.

injure yourself?" And I remember her telling me that she fell. And I don't know necessarily if I recall that it was on a train or anything like that at this point because it was a couple of years ago. I then inquired of her, you know, whether there was any possibility there may be a third party at fault and whether she may possess a third-party action.

Q. What did she say to you?

A. She said no. I know she told me there wasn't. I know that I felt very certain that she was certain that she didn't possess any third-party action.

But what I remember about it was her sort of pushing back from the table and looking down at her feet and sort of motioning down there and explaining that she fell. I remember her doing that. Beyond that, you know, I knew it was a fall, and I don't remember exactly what was said. I'm certain that I would have inquired further as to whether there was any possibility that a third party may be responsible that she could sue.

Q. Would the substance of that portion of the conversation as to whether or not she had any rights against third parties be reflected somewhere in the

assistant, maybe to replace her." Then there's something there about no computer.

Q. Is there a No. 4?

A. No.

Q. At that -- how long did that intake meeting last?

A. This is probably one of the best ones I've ever done, quite frankly. It's funny. It probably took 45 minutes because of the complications with the underlying health issues.

Q. Do you recall what was discussed at that meeting?

A. Yes.

Q. Do you recall -- you discussed with her a potential worker's comp. claim, I take it?

A. Yes.

Q. Did you discuss with her a potential claim against Amtrak at that meeting?

A. Yes.

Q. What do you recall about your conversation with Ms. Reis about a potential claim that she may have against Amtrak as a result of the fall in June 2004?

MR. COSTELLO: For the record I'm going to

object. Obviously the court has ordered that he answer it, but for the record I'm objecting to it.

A. Let me give you a general answer first and then I'll talk about specifics. Generally when a comp. claimant has a potential third-party case, I go over the worker's comp. claim first, and I will then tell them, after I've gotten all the facts I need for the insurance case, that there may be two cases and that they may have a potential claim against the owner of the property where they fell or the other driver in an auto accident case or something of that nature.

And the difference between the two cases is that, with respect to the worker's compensation claim, you recover weekly worker's compensation benefits, payment for medical expenses, and some limited amounts for any permanency or scarring that you suffer as a result of the injury.

The tort claim pays damages which exceed that -- which include and exceed that in the sense that there are -- there is a potential for recovery of pain and suffering, more wage recovery and othe damages, emotional distress and that type of thin

Q. Did you tell this to Elizabeth Reis?

A. Yes. Maybe not in those words, but generally speaking, that's what we talked about.

Q. And you indicated that you had a particular recollection of the conversation?

A. Yes.

Q. What was the particular recollection?

A. I remember -- I can see her in my office. I remember having this discussion with her, and I know we talked about it.

Q. Talked about it? Talked about what?

A. About the third-party claim.

Q. Against Amtrak?

A. Yes.

Q. Did you come up with a plan or strategy regarding the third-party claim against Amtrak that you relayed to Ms. Reis?

A. Yes. She told me that she had given a statement.

Q. Was this at the initial meeting she told you about the statement?

A. Yes. She told me she had given a statement.

Q. What did you say to her about that?

A. I wanted to know who she gave it to, and I

about?

A. Primarily about her comp. claim.

Q. During those conversations did the third-party claim against Amtrak -- or potential third-party claim against Amtrak ever come up?

A. It came up at least once that I know of because it's in one of the notes that I gave you, and in fairness, it probably came up a couple of other times, a few other times.

Q. Do you recall in particular what was discussed during those conversations?

A. She would ask me, as she did in the e-mails, whether I had talked to Seth Starr who was a claim representative for Amtrak.

Q. Do you recall when she made that first inquiry?

A. I don't. I know there's one in one of the exhibits.

Q. We'll get to the e-mails. I'm showing you what's been marked as Defendant's Exhibit No. 5 -- I'm sorry -- Farley 5. It's two pages. Can you tell me what that document is?

A. Those are -- or that is a communication, a letter I received from Mr. Costello with an

reviewed Elizabeth Reis's affidavit?
A. Uh-huh.
MR. DWYER: Mark that as Exhibit 5.
(Document marked as Jacquard Exhibit 5 for identification)
Q. Have you had the opportunity to review prior to this deposition Elizabeth Reis's affidavit?
A. I read it.
Q. When did you read Elizabeth Reis's affidavit?
A. Sometime last week. I noticed that it was attached to her subpoena, and I hadn't noticed it before that.
Q. How is it that you came about drafting your affidavit in this case?
A. I talked to Mr. Costello about the issue, and he explained to me the issue that's arising in her motion for summary judgment. I felt, you know, very strongly about how I conduct these interviews, the questions I ask. And I felt that I could put together an affidavit that is absolutely truthful that relates to the case.
Q. When were you first contacted by Mr. Costello to prepare that affidavit?

to that, anything related to Amtrak.

Q. So I guess my question is have you reviewed both your personal injury file and your worker's compensation file to determine whether there are any documents in the worker's compensation file and the personal injury file that are responsive to the subpoena?

A. Yes.

Q. So I have all the documents in your possession which are responsive to the subpoena?

A. Yes. Let me add one thing to that. There may be one other telephone record that I have that I didn't see in the privilege log which I would be happy to supply. That is a conversation that I had with Mr. Starr at Amtrak. He may have a record of it. I have a brief note about it. And just so the record is clear, that conversation was inquiring about the statement, "He would not let me have it," and he indicated that they had some questions about liability because in the statement she said she didn't know what she fell over. My recollection is that was in February or March, and I can't explain to you why that's not there.

Q. You'll provide that later?

A. Yes. Sure.
Q. That conversation was in February or March of 2005?
A. I think so, yes.
Q. Showing you what's been marked as Farley 7. Can you tell me what that is? This is the December 2004 letter. It's not in the packet.
A. Yes. That is a letter that I sent to Seth Starr at Amtrak with respect to this matter.
Q. Did Ms. Reis authorize you to send this letter?
A. Implicitly.
Q. You understood that to be part of your job?
A. Yes.
Q. What was the purpose of sending this letter?
A. I wanted to get the letter -- the statement that she had sent -- could I take a look at it again?
Q. Sure.
A. That is what I call a letter of representation.
Q. Did you ever have a conversation with anyone at Amtrak regarding Ms. Reis before this

letter was sent?
A. Before that?
Q. Yes.
A. No.
Q. Did you ever have any conversations with anyone at Amtrak after this letter was sent?
A. I spoke to Mr. Starr again in February or March of '05.
Q. How long was that conversation?
A. Five minutes, if that.
Q. As best you can recall what did you say and what did he say in response?
A. I said, "Did you know I represent Ms. Reis with respect to this injury? She told me she gave a statement. Can I get a copy?" He said, "No. It's our policy not to give them out." And I said, "Well, can you tell me generally what was said?" And he gave me an idea of what she said. He said the problem from their point of view is she couldn't say what she tripped over or fell over.
Q. At any point did you discuss -- you made it clear to Mr. Starr that there was a potential action against Amtrak by your client, Ms. Reis, correct?
MR. COSTELLO: Objection.

A. I'm assuming he understood that.
MR. COSTELLO: I move to strike.
Q. Did you ever make a demand for money?
A. No.
Q. Did Mr. Starr ever request anything that he might need to evaluate the claim such as medical records and the like?
MR. COSTELLO: I can't hear you.
Q. Did Mr. Starr ever request anything that he might need to evaluate the claim such as medical records or the like?
A. Not that I recall.
Q. How did you leave it with Mr. Starr? That you would call back or that he would call you? How was that left?
A. It was kind of -- my recollection is it was just left open-ended.
Q. I would like to turn to Exhibit 2 which is the notes. I would like to turn first to the --
MR. COSTELLO: What is No. 2, please?
MR. RYAN: E-mails.
MR. DWYER: It's the e-mails.
MR. COSTELLO: Oh, okay.
Q. The first e-mail I would like you to look

at is dated Friday, November 19, 2004, entitled "Subject: Resend Amtrak info." Did you receive an earlier e-mail from her on this, on Amtrak, because it notes "Resend"?

A. Not having to do with this claim, no.

Q. Do you know why she sent this e-mail to you? Was it at your request for information or was it something that she did on her own?

A. What may have happened is that when I did the interview she mentioned that she gave a statement but couldn't tell me who it was to, and this looks like a follow-up to that part of the inquiry.

Q. She said that she -- did she say why -- did she tell you why she contacted the Amtrak claims office?

A. Because she fell.

Q. Did she tell you that she was making a claim against Amtrak at that time?

A. Not in so many words. I mean, she didn't say, "I'm making a claim." She said -- she felt she fell on their property; therefore, she may recover from them.

Q. Is that what she's referring to when she

states, "She took the general info as to why I was calling"?

A. I'm sorry. Where are you reading?

Q. I'm in the second paragraph, second sentence.

MR. COSTELLO: Objection.

A. Yes. It looks to me like a couple of days after she fell she called and said she wanted to give them information. I didn't represent her at this time so I don't know what her intent was.

Q. Now, she stated that, quote, "I surely hope that you're able to settle for a substantial amount," close quotes. Did she ever discuss with you what a substantial amount would be in her mind?

A. No. In terms of the third-party claim, no.

Q. Did she ever discuss with you how quickly she wanted her money?

MR. COSTELLO: I didn't hear your last -- how what she wanted?

MR. DWYER: Quickly she wanted.

Q. Did she ever tell you how quickly she would want her money from the settlement in a tort claim against Amtrak?

A. No.

Q. Did Ms. Reis ever tell you that she fell over a passenger's bag?

MR. COSTELLO: I am going to object to that. I think that goes beyond --

MR. DWYER: No. That's a conversation that she had regarding a potential claim against Amtrak. And my question is did she ever tell her counsel whether or not she tripped over another passenger's bag on the Amtrak train on the day of the injury.

MR. COSTELLO: That's what you're doing. You're trying to find out the validity of her claim not whether she thought she had a claim.

MR. DWYER: Are you instructing him not to answer?

MR. RYAN: He can't instruct him to do anything.

MR. COSTELLO: I'm not instructing him to do anything.

MR. RYAN: I know he doesn't. I don't understand what he's doing. You can answer.

A. You're asking me did she ever tell me that she tripped over another passenger's bag?

Q. Yes.

A. My recollection is that she did not say

school, that you -- the problem is if you slip on a banana peel, you are supposed to see the banana peel and, therefore, avoid it. And that's the difficulty common to slip and fall cases. I'm sure I had that conversation because I tell all of those clients that story.

Q. Do you know when you would have had that conversation with Ms. Reis?

A. I probably would have had it when I saw her at the initial interview. We may have had that conversation later on.

Q. At some time you became aware that she filed for bankruptcy, correct?

A. Apparently. I didn't know it currently, but apparently I had constructive notice of it back then.

Q. And she indicated that in an e-mail from her dated April 13, 2005, correct?

A. Yes.

MR. COSTELLO: Are the e-mails all considered Exhibit 2?

MR. DWYER: Yes. I'm just going through part of Exhibit 2, and I'm just moving by date.

Q. Did you have any discussion with Ms. Reis

that if she did file for bankruptcy she may have to identify either the worker's comp. action or the potential tort claim against Amtrak in her petition for bankruptcy?

A. Not that I recall. It looks to me from the e-mail that I learned of the bankruptcy not so much in a conversation but in the e-mail, and apparently she told my secretary about it. But I don't recall specifically discussing those issues with her.

Q. How do you know she told your secretary about that?

A. That's who Maria is in the e-mail, No. 3A, "As I asked your assistant Maria to share with you this whole incident that I had to file for bankruptcy."

Q. Then in looking at the e-mails in Exhibit 2 dated May 4, May 9, May 13, May 16 of 2005, June 1, 2005, she asked you in those e-mails as to whether or not you've contacted anyone from Amtrak or Seth Starr from Amtrak, correct?

A. Correct.

Q. During that period of time had you contacted anyone at Amtrak or spoken --

A. No.

conversation prior to June 7?
A. I read that -- the "continuing" -- I read the "continuing" to mean rescheduling of the comp. case.
Q. I see. Again, she asks you to please let her know how things stand with Seth Starr at Amtrak correct?
A. Correct.
Q. Had you contacted Seth Starr between June 1 and June 7?
A. No. Again, not that I recall. There was that one conversation that I had with him, and that's the only one I recall.
Q. And then she indicated that she desperately needs to recoup her financial losses from the accident, correct?
A. Yes.
Q. You responded to that e-mail below, correct, about a minute later? No. I'm sorry. I'm sorry. Strike that.
You actually initiated the e-mail at 11:21 a.m. to which she responded at 11:20 p.m.?
A. Right. That's where the "continuing," I think, comes from.

contact information in it, things like that, so that it's -- it's a record of what goes on in a case. Go ahead.

Q. Are these notes made by you -- are these entries made by you or your assistant?

A. They are made by me.

Q. Turning your attention to the entry dated Monday, June 13, 4:19 p.m., phone call," you spoke for approximately 12 minutes; is that correct?

A. Well, the office bills in tenths of hours so it might have been seven minutes.

Q. It just says, "Spoke duration, 12:29." It's pretty particular.

A. I didn't even know it did that. Okay.

Q. She indicates that -- or your note indicates, "She will send bills to me and Ejnes note," and then she confirms she doesn't know what caused her fall?

A. Correct.

Q. There would be no reason in relation to the worker's compensation claim to discuss what caused her fall, correct?

A. Correct.

Q. So that conversation you had with her on

June 13 of '05 dealt, at least in part, with any potential claim against Amtrak, correct?

A. That is correct.

Q. Do you recall what was said during that conversation on June 13th?

A. Specifically, no. I think what I was -- she probably, once again, brought up the Amtrak situation, and I asked her, "Can you tell me what you fell over?"

Q. After you sent the letter dated December 1, 2005, to Mr. Starr, did you have any conversations with Ms. Reis regarding the results of that letter or just sending that letter?

A. I'm sure I told her that I never got the report; that they wouldn't send it to me. And I believe I told her in order to get it I'd have to start suit.

Q. What did she say about that?

A. The conversation went something like this: "It would be Federal Court. It would be expensive, and I would like to try and see if I could get that report without that."

Q. What did she say?

A. "Okay." I mean, she accepted it.

be as honest and complete as possible.

Q. Did your review of that entire personal injury file assist you in your recollection in testifying today?

A. Yes. This is the personal injury file (indicating). There's two pages in it, one of which is the November 19th, 2004, e-mail from Ms. Reis, and that may have been what caused me to set up this file, and then the letter to Mr. Starr.

Q. I see. So the entire personal injury file is two pages?

A. Correct. The medical, all of that stuff, because the worker's comp. case was ongoing, was kept in the comp. file.

Q. If the case had proceeded to suit in Federal Court with you as her attorney, would the medical records have been transferred from the worker comp. file or copies put into the personal injury file?

MR. COSTELLO: Objection, speculative.

A. They would have been copied.

Q. What's your home address, sir?

A. 41 Kingsford Avenue, East Providence, Rhode Island 02915.

Q. To the best of your recollection have you told me about all the conversations that you've had with Ms. Reis regarding a potential claim against Amtrak while you represented her?

MR. COSTELLO: Objection.

A. There may have been others because what would happen is I would talk to her in connection with her worker's comp. case, and there may have been another inquiry about this. I just -- those kind of things I wouldn't normally take down.

Q. You made it clear to Ms. Reis, did you not, during the course of your representation of her that she had a potential claim against Amtrak?

MR. COSTELLO: Objection.

A. That she had a potential claim?

Q. Yes.

A. I told her that there was a possibility of a claim.

Q. Did you ever contact a potential expert witness in regards to the potential tort claim?

A. No, other than the physicians.

MR. COSTELLO: The physicians was in relation to the worker's comp. claim?

THE WITNESS: Correct.

you have decided to bring a third-party claim in connection with the above WC matter." I do not have a reply to that.

MR. COSTELLO: I didn't hear the end of your comment.

THE WITNESS: I don't have a reply to that. I'm sorry.

A. I apologize for this. I didn't look at it with that question in mind.

Q. That's fine.

A. While I'm going through the correspondence in the worker's compensation file, I do find a response from Seth Starr dated December 9, 2004.

Q. What does that say?

A. It's addressed to me, "Re: Elizabeth Reis. Date of injury 6/23/2004. Dear Attorney Farley, this will acknowledge receipt of your letter dated December 1, 2004, notifying Amtrak of your representation of Elizabeth Reis. Please advise me of the present medical status and kindly forward copies of all medical reports and medical bills regarding Elizabeth Reis. If you have any questions, please contact me at 617-345-7628. Very Truly Yours, Seth A. Starr, claims representative."

Q. And those are, you would agree with me, some of the most difficult cases to prove; is that not true?
A. In my experience, yes.
Q. And one of the obligations or one of the burdens you have to get over is the burden of notice; is that correct?
A. Yes.
Q. In this particular case, from your discussions with Ms. Reis, she did not apparently tell you how she fell or couldn't tell you how she fell; is that correct?
A. Correct.
Q. Did you feel that that was a major problem as far as proving liability in this case?
A. Yes.
Q. This influences you as far as your ultimate decision as to whether you would pursue this claim on her part?
A. I never really made a decision one way or another.
Q. So is it fair to say that you never actually decided to pursue this claim on her behalf?
MR. DWYER: Objection.

A. I decided to look into it.

Q. And you've done that many times, is that correct, in the past?

A. Yes.

Q. And some of them you followed through and some of them you never followed through or you didn't pursue; is that correct?

A. Correct.

Q. In this particular case you had it at least from August 12th or 13th of 2004 until the autumn of 2005, correct?

A. Correct.

Q. Even in your correspondence with Beacon Mutual in Exhibit No. 10 -- strike that -- Exhibit No. 11, you never responded to Ms. Etchingham's inquiry as to whether you had decided to bring a third-party claim because you hadn't decided, had you?

A. That's correct. Well, let me -- I sent a letter of rep out, but I hadn't started suit. So I don't know what you mean by "pursuing a claim."

Q. Well, in addition to filing suit, generally speaking, before you would file a suit you would probably do some other things, too, would you not?

33 COLLEGE HILL ROAD
SUITE 20D
WARWICK, RHODE ISLAND 02886

401.822.1800 EXT. 6
401.822.1879 (FAX)

DANIEL K. FLAHERTY
e-mail: DFlaherty@collegehill.necoxmail.com
FREDERICK A. COSTELLO*
e-mail: fac15@aol.com
*also admitted in New Hampshire & Virginia

CHARLES BUTTERFIELD, JR. (1930-2003)

**FLAHERTY, BUTTERFIELD, & COSTELLO**

**Attorneys and Counselors at Law**

DEFENDANT'S EXHIBIT FARLEY-5

October 20, 2005

Michael Farley, Esquire
670 Willett Avenue
East Providence, RI 02915

**Re: Elizabeth Reis Transfer of file**

Dear Mr. Farley:

Enclosed please find an Authorization to Transfer file signed by Elizabeth Reis. It would be appreciated if you forward your file concerning her personal injury case and workers compensation case to this office at your earliest convenience.

If you have any questions concerning this, please do not hesitate to call me.

Thank you.

Very truly yours,

**FLAHERTY, BUTTERFIELD & COSTELLO**

**FREDERICK A. COSTELLO**

Fac/jwb
Enclosure