# EXHIBIT I

Volume I
Pages 1 to 53
Exhibits 1 to 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| ELIZABETH A. REIS, Plaintiff, | |
| vs. | Civil Action No. 07-236S |
| NATIONAL PASSENGER RAILROAD CORPORATION, A/K/A NATIONAL RAILROAD PASSENGER CORPORATION, Defendant. | |

- - - - - - - - - - - - - - - - - -x

DEPOSITION OF ROBERT B. JACQUARD, a witness called on behalf of the Defendant, taken pursuant to the Federal Rules of Civil Procedure, before Grant D. Hackett, Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on Tuesday, May 6, 2008, commencing at 10:43 a.m.

PRESENT:

Flaherty, Butterfield & Costello
(by Frederick A. Costello, Esq.)
33 College Hill Road, Suite 20D, Warwick, RI 02886, for the Plaintiff.

Edwards Angell Palmer & Dodge, LLP
(by Paul E. Dwyer, Esq.)
2800 Financial Plaza, Providence, RI 02903-2499, for the Defendant.

* * * * *

bankruptcy law?

A. Well, I first go through, I ask about individual pieces of property. I ask them first about their real estate. If they own real estate at the time, I then ask them specific questions about that. I also inquire about any other real estate they've owned in the previous five years. Then I ask them about any cars or vehicles they own. Then I inquire about any cash they may have on hand, any accounts whatsoever they have on hand in any bank or financial institution, checking accounts, 401Ks and so forth. I inquire about their furniture, clothing, jewelry, whether they have any life insurance policies.

I ask these questions in that order so that I'm certain in my mind I did not miss anything. And then I follow up with, I say, "Do you own any other property whatsoever?" And then I follow that up with, "Do you have any claims against anyone or do you have a right to sue anybody for any money or have you been in any accidents in the last three years in which you may be able to sue anyone?"

Q. Did you ask Elizabeth Reis that question?

A. I don't specifically remember it, but I

know I ask it in every single circumstance. It's so important to do that because my clients are going to be pretty upset at me if they lose a piece of property. That's probably the thing they're most concerned with when they file bankruptcy. I tell them, "If you want me to be able to advise you properly, you need to tell me everything that you have, everything that you own. I stress that. And then at the end -- I follow it in that order. At the end I ask about any lawsuits they may have.

Q. She told you about the worker's comp matter that she had?

A. Yes.

MR. DWYER: Let's mark as Exhibit 3 Attorney Jacquard's affidavit, please.

(Document marked as Jacquard Exhibit 3 for identification)

Q. Sitting here today do you have a recollection of what she told you about the worker's comp claim?

A. There is one thing I do remember about it.

Q. What is that?

A. Well, I remember her telling me she had a worker's comp claim. And I asked her, "How did you

injure yourself?" And I remember her telling me that she fell. And I don't know necessarily if I recall that it was on a train or anything like that at this point because it was a couple of years ago. I then inquired of her, you know, whether there was any possibility there may be a third party at fault and whether she may possess a third-party action.

Q. What did she say to you?

A. She said no. I know she told me there wasn't. I know that I felt very certain that she was certain that she didn't possess any third-party action.

But what I remember about it was her sort of pushing back from the table and looking down at her feet and sort of motioning down there and explaining that she fell. I remember her doing that. Beyond that, you know, I knew it was a fall, and I don't remember exactly what was said. I'm certain that I would have inquired further as to whether there was any possibility that a third party may be responsible that she could sue.

Q. Would the substance of that portion of the conversation as to whether or not she had any rights against third parties be reflected somewhere in the

notes in your file?
A. If she said she possessed it, I would have written a note down there that she had a personal injury claim.
Q. Do you recall what she told you as to how the accident occurred for which she received worker's comp?
A. The only thing I remember was that it was a fall, to be honest with you.
Q. If you could look at your affidavit. Take a moment to read that.
A. (Witness complies) I remember it.
Q. Okay. In the last -- did you ever advise Ms. Reis that she did not have a potential claim against Amtrak?
A. No.
Q. Do you recall her stating at any meetings to you at anytime during the course of your representation that she tripped and fell over a passenger bag in the aisle of the Amtrak train?
A. I don't recall what it was at this point that she said she tripped over.
Q. Would it refresh your recollection if I indicate that she also stated that after she tripped

would have met with Ms. Reis originally at my Park Avenue office.

Q. If you had a question regarding whether or not someone had a potential personal injury claim, was there a particular personal injury attorney that you would consult with before you joined Gemma?

A. That was Seth Perlmutter's office. I could ask him about it, sure.

Q. That would be your practice if you had a question regarding a personal injury claim?

A. Yes. I mean, I probably surmise she tripped over her own two feet or tripped over something that was not out of place or something like that. Nothing in what she told me led me to believe she had a personal injury claim against anyone or that she believed that she did.

Q. Did she tell you that she had contacted Amtrak and given a statement on the phone in June of, in July of 2004?

A. I don't recall her saying that.

Q. Did she advise you that her worker's comp attorney had contacted Amtrak in December of 2004?

A. I don't recall her saying that either. And also, I think that the whole discussion about this

worker's comp issue only lasted a very short period of time. Some of the things you're saying would have taken her a long time to explain. I don't recall any long conversations with her about this whatsoever.

Q. When you were asking a client about the circumstances of a worker's comp claim, how detailed do you get with your questions, generally?

A. As detailed as possible until I feel satisfied.

Q. So you do not rely upon a lay person, such as Elizabeth Reis, saying, "Oh, no, I don't have any third-party personal injury claims arising from this worker's comp matter." You make that judgment for yourself based upon the facts relayed to you by the debtor, correct?

A. I would say, "How did the accident happen"; have it explained.

Q. Once it's explained to you, you make your judgment based on the facts you're told by the debtor, correct?

A. That is correct.

MR. DWYER: Mark this as Exhibit 4.

reviewed Elizabeth Reis's affidavit?

A. Uh-huh.

MR. DWYER: Mark that as Exhibit 5.

(Document marked as Jacquard Exhibit 5 for identification)

Q. Have you had the opportunity to review prior to this deposition Elizabeth Reis's affidavit?

A. I read it.

Q. When did you read Elizabeth Reis's affidavit?

A. Sometime last week. I noticed that it was attached to her subpoena, and I hadn't noticed it before that.

Q. How is it that you came about drafting your affidavit in this case?

A. I talked to Mr. Costello about the issue, and he explained to me the issue that's arising in her motion for summary judgment. I felt, you know, very strongly about how I conduct these interviews, the questions I ask. And I felt that I could put together an affidavit that is absolutely truthful that relates to the case.

Q. When were you first contacted by Mr. Costello to prepare that affidavit?

A. It might have been a month ago. I'm not sure. Actually, more than that, obviously. Two months ago or so.

Q. Did you have your file with you to review prior to executing that affidavit?

A. No.

Q. Do you execute this affidavit based solely upon your memory?

A. Yes.

Q. You indicated earlier in your testimony that there were things in this affidavit which Ms. Reis did not tell you; is that correct?

A. I don't recall that. Oh, in this affidavit? Yes. I don't recall her ever telling me a lot of these things, no.

Q. Can we go through paragraph by paragraph whether or not you recall what she told you. And I'll direct your attention to certain paragraphs.

Looking at Paragraph 2, what material in Paragraph 2 of Elizabeth Reis's affidavit did she tell you?

A. I'm sure she told me that she was on, slipped on a train. Other than that, I don't recall anything like her mentioning "business trade show"

forms. You'd have to use my computer.

Q. I'm just trying to figure out what she means by she "filled out the forms by your instruction."

A. (Witness shakes head)

Q. But she didn't?

A. No.

Q. Did she ever tell you she was not making a claim against Amtrak?

A. Definitely not. That would have alerted me that maybe she believes she has a claim and she's choosing not to make it. That would be a red flag with me. My belief at the time I filed this was that she did not possess a claim. I think that her -- my opinion is that she misspoke in Paragraph 20, that she actually believed she did not possess a claim, not that she had a claim and was not making it. Nothing -- if any client told me something to make me believe they had a claim but weren't possessing it, I'd explain to them, "You have no choice but to pursue that claim." It's property they possess, and the trustee would be interested in it. It would amount to a bad-faith bankruptcy filing to possess some property which they could

maybe pay their creditors with and not pursue it.

Q. What is the standard that you as a bankruptcy attorney applied in determining whether or not to list a potential third-party claim?

A. If there is any belief at all that it may be a colorable claim, it's listed. I've had many petitions where I've listed "potential personal injury claim" or "potential slip and fall," you know. I might say in there, but it's unlikely, whatever. My style in filling out these petitions is to overstate things. I just do. I overstate things to be on the safe side.

Q. What is the effect in the bankruptcy courts of failing to list potential third-party claims that the debtor may have?

A. Well, the worst case scenario it could amount to a criminal violation. I think -- it's not going to happen for your average slip-and-fall, but let's say you had a person with $100,000 claim and he knew he was getting paid next week. He has all kinds of documentation he's received from his lawyer. He knows absolutely if this is coming through. At that point it's rising to the point of criminal, that you're defrauding your creditors.

But for the most part a person is allowed to amend their petition for simple omissions or mistakes. And in between those two extremes I think there is a possibility that the petition could be dismissed and discharge not entered and potentially even the person being barred from coming back to the Bankruptcy Court with their claims.

Q. How hard is it to reopen a bankruptcy petition?

A. It's not hard, as a general rule.

Q. After this lawsuit was filed, did Elizabeth Reis ever come to you and say, "I've just filed a personal injury action in the Providence Superior Court against Amtrak. Should I amend my petition?"

A. No. She never contacted me about it.

Q. What was the last contact you had with Elizabeth Reis?

A. I do recall she was very slow in paying me. And I recall that the case stayed in my file for quite a few months after. Basically I let her pay slowly because she was trying to raise her sister. She periodically sent me in checks. I may have -- she may have called me on the phone or something like that and said that they're on the way in.

he was interested in, he could open it himself.

Q. Did anybody ever come to you and say -- either Ms. Reis's attorney or Ms. Reis herself -- come to you and say, "I've just filed this case against Amtrak. What should I do?"

A. No.

Q. On the bankruptcy petition, can you identify where you would list a potential third-party claim.

A. Sure. On Schedule B, the very last type of property, Number 33, "Other personal property of any kind not originally listed." I would have listed -- I might have put it in the same paragraph or listed it separately from the worker's comp.

Q. Could it be listed in Paragraph 20, I'm sorry, in Category 20, "Other contingent unliquidated claims"?

A. I've never put it there.

Q. No?

A. The main thing is that it's listed.

Q. That it's listed?

A. Yes.

Q. Reading Paragraph 6 of your affidavit it struck me that Paragraph 6 related -- strike that.

Reading Paragraph 6 I was under the impression that you didn't really have a recollection of specific conversations that you had with Ms. Reis and specific answers that she gave, and this just reflects your general practice; is that correct?

A. Like I said, the only thing I specifically remember about the conversation with Ms. Reis is her pulling back a little bit and motioning towards her feet and saying that she didn't have any ability to sue anybody else for her injury, that type of thing. The other things that you asked, you know, I don't recall being said at all, and may not have been said. And yes, it also lists my practice with each and every case.

Q. Is the fact that the claim against Amtrak is not listed in the bankruptcy petition of Ms. Reis the sole basis for your statement in Paragraph 6 that, "If I felt there was any chance of this, I would have listed it as a potential property on Schedule B of her petition"?

A. Yes.

Q. How did you prepare for this deposition today?

Q. No, okay. And in reference to your questioning of Ms. Reis, when you got to the point when you were discussing her injury and the worker's comp claim, you said that that's a particular area that you are very careful about. Is that a fair statement?

A. Yes.

Q. And when you were questioning Ms. Reis, do you have any memory of her being evasive or holding anything back from your interview?

MR. DWYER: Objection. Calls for speculation. You can answer.

A. Definitely not.

Q. Okay. And when you were asking questions, did you ever feel that she wasn't being completely candid with you in her responses?

A. No.

Q. And you were aware that she had an injury and she was making a claim for an injury to her worker's comp insurer; is that correct?

A. Yes.

Q. Mr. Farley was her attorney?

A. Yes.

Q. To your knowledge, did she ever indicate to